Herman L. HAMPTON, Appellant,

v.

STATE of Alaska, Appellee.

No. 2741.

Supreme Court of Alaska.

Sept. 9, 1977.

E. J. Fyfe, Anchorage, for appellant.

Glen C. Anderson, Asst. Dist. Atty., and Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and BURKE, JJ., and CARLSON, Superior Court Judge.

## OPINION

RABINOWITZ, Justice.

After trial by jury, Herman Hampton was found guilty of first degree murder and was sentenced to life in prison. In this appeal Hampton advances five specifications of error and also attacks the sentence on the ground that it is excessive. Our analysis of the record and the legal arguments presented by the respective parties has persuaded us that Hampton's conviction should be affirmed and that the sentence imposed by the trial court was not excessive.

The relevant facts are as follows: On June 27, 1974, Hampton's friend, Calvin Hodge, met Hampton at his home about 3:00 p. m. Hampton had recently been involved in an automobile accident in which he had suffered a badly broken leg. At this time, Hampton was in a full-leg cast and was unable to move about freely.[1] Hodge went to a liquor store and returned with a fifth of bourbon and 2 six-packs of 16-ounce beers. Hodge testified that they drank approximately two glasses of bourbon and one beer apiece. At Hampton's suggestion, they went out to buy a gun. Hampton purchased a .357 Smith and Wesson Model 28 revolver and one box of .357 hollow point bullets. They bought another fifth of bourbon, 2 more six-packs and some chicken before returning to the apartment. They spent the next 2-3 hours playing records, drinking and eating. At Hodge's suggestion, they decided to ride around the Anchorage downtown area. Then at Hampton's request, they went to the home of Jerry Berfield to obtain something to deaden the pain Hampton was experiencing. Hampton received heroin from Berfield which was injected into his body. Hampton and Hodge remained at Berfield's watching television and drinking. Hampton fell asleep; after he had awakened, Hodge left the room. While Hodge was out of the room, Hampton allegedly shot Berfield five times with the gun he had previously purchased. Hodge and Mrs. Berfield (Berfield's ex-wife), neither of whom actually saw Hampton shoot Berfield,[2] ran out of the house.

When Officers Hyde and Moen of the Anchorage Police Department arrived, Hampton was seated near Berfield's body. When they entered and saw a revolver near Hampton, one officer pointed his weapon at Hampton and told him not to touch the gun. He testified that Hampton stated, "[M]ove it [the gun] before I shoot somebody else." The other officer gave Hampton his *Miranda* warnings. Hampton asserted that he knew his rights and did not want to talk. Hampton was helped out of the house and was taken to the police station. At the police station, Hampton was interviewed by Officer Rice. Rice testified that he advised Hampton of his rights and that Hampton interrupted him, stating that he knew his rights and that it was a waste of time. Rice completed reading the *Miranda* form. After Hampton made incriminating statements to Rice,[3] he requested that he be allowed to sleep and said that he might be able to handle it better the next day.

The following day Hampton was interviewed by Officer Carter and Investigator Pennington. After they advised him of his rights, Hampton signed and initialed a

---

1. Hampton had complained of pain since the time he was released from the hospital on June 25.

2. Mrs. Berfield did not testify at the trial. She and her lawyer had previously informed the court and counsel for the state that she would claim the fifth amendment privilege on all questions pertaining to the incident. Mrs. Berfield testified at the suppression hearing that she had sold Hampton heroin and injected him with it.

 Hodge testified that he heard a shot and saw Berfield flinch and draw up. However, he did not see who held the gun.

3. According to Officer Rice's testimony, Hampton said he had been involved in the shooting incident and said that it was more Berfield's fault than his.

waiver form. During the course of this interview, Hampton made a tape-recorded statement admitting that he shot Berfield and that he had previously threatened Berfield's life.

Subsequently, Hampton requested that the superior court suppress his statements made during custodial interrogation. Hampton contended that the statements made to Officer Rice should be suppressed because there was no express waiver of his *Miranda* rights and because his intoxication rendered him legally incapable of making a valid waiver of those rights. Hampton sought suppression of the statements made to Investigator Pennington on the ground that they were the fruit of the previous unconstitutionally obtained statements. After a lengthy evidentiary hearing, the motion to suppress was denied.[4]

Hampton has advanced a twofold constitutional challenge with respect to the statements made by him to the police. First, he asserts that the statements obtained at the police station on the evening of the incident were taken in violation of his privilege against self-incrimination as guaranteed by the fifth amendment to the United States Constitution and article I, section 9 of the Alaska Constitution. He also asserts that utilization of those statements violated his due process rights guaranteed by the 14th amendment to the United States Constitution and article I, section 7 of the Alaska Constitution. Thus arguing that the earlier statements were obtained or used unconstitutionally, Hampton asserts that the taped confession of June 28 should be excluded as "fruit of the poisonous tree."[5] These arguments will be discussed *seriatim*.

In articulating its reasons for denial of the suppression motion, the superior court, as trier of the facts, made particular note of these significant facts: Hampton asserted vocally that he knew his rights, the officers testified he was responsive, and Hampton "clearly remembers talking to the police and telling them what happened." The superior court concluded:

> All of this tends to indicate a certain awareness and an ability to reason on the part of the defendant. His own testimony demonstrates that at the time of the first interview he was not so benumbed or confused that he had no understanding or a realization of what was going on or what he was saying. It cannot be said then as a matter of law that defendant's mental capacity was so impaired at the time of the first interview that he was incapable of making a knowing waiver.

We think the superior court did not err in determining the merits of Hampton's suppression motion.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 707 (1966), the Supreme Court of the United States held that the accused may waive fifth amendment rights "provided the waiver is made voluntarily, knowingly and intelligently." Hampton does not dispute that he was advised of his *Miranda* rights prior to each interrogation. His contention is that he did not effectively waive his *Miranda* rights. Pointing to the totality of the circumstances, including intoxication from alcohol, injection of heroin, and absence of an express waiver, Hampton asserts that the state failed to meet its burden of showing he made a knowing, intelligent and voluntary waiver.[6]

---

4. Hampton sought review of that denial in this court, but review was denied.

5. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

6. In *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966), the Supreme Court stated that when interrogation occurs without the presence of an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly

and intelligently waived his privilege against self-incrimination . . . .."

The prosecution must prove that the confession is voluntary by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618, 627 (1972); *Schade v. State*, 512 P.2d 907, 917 (Alaska 1973). Although the material excised from the superior court's decision and quoted, *supra*, does not indicate that the court placed the burden on the state by a preponderance, the

In *Thessen v. State,* 454 P.2d 341, 345 (Alaska 1969), we said:

> It is entirely possible that one could be so intoxicated or under the influence of drugs that he could not knowingly and intelligently waive his constitutional rights. Whether this is so depends upon the facts of each particular case. (footnote omitted)

We thus deem it appropriate at this point to examine the record closely in light of the superior court's determination of the facts pertaining to this issue.

Officer Moen testified that when he entered Berfield's home, Hampton was seated near Berfield's body. He had a drink either in his hand or in his lap. Moen read the *Miranda* warnings to Hampton and Hampton responded that he knew his rights. Moen testified:

> [Hampton] seemed very calm. The only thing that excited him—or appeared to excite him or bother him in any way was the fact that the weapon was alongside him, he wanted that away from him. He had been drinking—or it appeared to me that he had been drinking.

Moen noticed that there was a smell of alcohol around Hampton; however, Hampton responded to his questions. Moen also testified that Hampton's speech was slurred but understandable, and that had he encountered Hampton on the street he would not have arrested him for public drunkenness.

Officer Hyde testified that Hampton was "nonchalant" when he told Moen that he knew his rights, and that Hampton "reacted very calmly under the situation." Hyde noted that Hampton had been drinking and that his eyes were dilated. However, Hyde testified that Hampton was responsive to questions, spoke clearly and "seemed to have control of his faculties."

Officer Imperial testified that he saw an empty liquor bottle near Berfield's body. He also assisted in taking Hampton to the police car and testified that Hampton's speech was slower than normal.

Officer Rice, who conducted the interview of Hampton at the police station, testified that he gave Hampton the *Miranda* warnings; Hampton repeatedly interrupted, stating that he knew his rights. Rice asked Hampton if he understood his rights; he indicated that he did. However, Rice did not secure a written waiver. Hampton made incriminating statements to Rice[7] and then said he did not want to continue the interview. They continued talking for another 15-20 minutes.[8] Rice testified that Hampton "appeared alert," "responded to every question," and spoke slowly but not indistinctly. Rice stated:

> It was obvious to me that he had taken something. I asked him if he had taken any drugs or I believe I used the word dope specifically. He stated he had not. I asked him if he had had any intoxicants and he indicated that he did [*sic*]. He indicated he was taking alcohol for, I believe, pain and that he had just about enough to where he was feeling pretty good.

Rice also indicated that he did not believe Hampton "was incoherent or . . . intoxicated." Rice testified that Hampton was very calm and spoke in a monotone except for one occasion when he became angry and blamed Berfield for what had happened, and another when he became irritated with Rice because he was "tired of telling his story."

Officer Dennis, who was standing outside the door when Rice was interrogating Hampton, corroborated Rice's testimony with respect to the *Miranda* warnings.

---

remainder of the decision shows that the court did so.

7. Rice testified:

> I asked him if he was involved in the shooting of the individual. He indicated that he was. I asked if he knew his name and he identified him as Jerry. I asked him why he did it and he indicated that he'd been asking

for it, or words to that effect, and that he didn't really want to talk about it too much but he would the following day.

8. There is nothing in the record which would indicate that they discussed the offense or that Hampton made further incriminating statements in the continuation of the interview.

Dennis testified that Hampton was intoxicated, his eyes were bloodshot and a little watery, and he generally spoke in a monotone.

Charlotte Berfield, ex-wife of Jerry Berfield, appeared at the suppression hearing and testified on direct. However, she did not reappear for cross-examination. Ultimately, the parties agreed to strike her testimony and stipulated that she would testify that Hampton was injected with heroin the evening of the shooting and that she saw him consume a substantial amount of alcohol at Berfield's home.

Hilary MacConaill, the clinical director of the Narcotics Drug Treatment Center, testified on behalf of Hampton about the effects of heroin. MacConaill stated that the effects of heroin "would depend on the way the drug was used . . . and how much, but generally a person would be lulled into a very false kind of security." She said that when an individual is high on heroin, he or she is in "an unrealistic world where nothing bothers you and anything that may aggravate you, you can overcome one way or the other." MacConaill also testified that when a person is awakened from a "nod"[9] and an individual with acknowledged authority over the person requested performance of a task, that person would probably perform the task as rapidly as possible so he could resume nodding. She stated that the person would not be particularly concerned with what acts constituted the task.

At the suppression hearing, Hampton took the stand in his own behalf. He testified that prior to the time he went to Berfield's, he had ¾ of a fifth of bourbon and some beer. He went to Berfield's to obtain heroin to kill the pain caused by his broken leg. Berfield sold him $60 worth of heroin which Mrs. Berfield injected into his arm, probably not into the vein. He later received another $40 worth of heroin from Berfield who injected it directly into the vein. Hampton testified that he immediately went to sleep after the second injection; he was holding a lighted cigarette which burned his hand and trouser leg. He did not remember anyone reading him his rights. He testified that he was not in pain while he was questioned at the station, but that he was disoriented and was not sure if he was in jail. He also testified that he did not remember much of the occurrences as to which the officers who recorded his confession the following day testified.

Phillip Briggs, a correctional officer at the state jail annex, was in charge of booking Hampton after the interrogation. Briggs testified that Hampton "seemed to be under some kind of influence other than alcohol, drugs or some kind of medication." He said that Hampton was not responsive and was "speaking kind of incoherently." He was unable to obtain the booking information from Hampton. Hampton was "kind of swaying when he was standing," and fell asleep very soon after being placed in his cell.

In the taped statement taken the following day, in response to the question, "Do you feel that you drank enough liquor to make you intoxicated?", Hampton responded, "Yeah, I drank enough to fall asleep . . . ." When asked if he was thinking clearly, Hampton responded, "Yeah, I was thinking clearly. Something was wrong with his [Jerry's] thinking, there wasn't nothing wrong with mine."

Our review of the evidence in regard to this specification of error has left us with the conviction that there is an adequate evidentiary basis for the superior court's conclusion that Hampton possessed the mental capacity to make a knowing and intelligent waiver of his *Miranda* rights.[10]

9. A "nod" is a narcotic-induced sleep. Not all individuals who have taken narcotics and are sleeping are nodding. The quality of the sleep primarily depends on the quantity of narcotics which the individual has taken.

10. *See United States v. Martin,* 434 F.2d 275 (5th Cir. 1970); *Reizenstein v. Sigler,* 428 F.2d 702 (8th Cir. 1970); *Bell v. United States,* 60 App.D.C. 76, 47 F.2d 438 (1931); *State v. McFall,* 5 Ariz.App. 539, 428 P.2d 1013 (1967). *Logner v. North Carolina,* 260 F.Supp. 970 (M.D.N.C.1966), presented a stronger case on its facts for a finding of involuntariness than does the case at bar.

Admittedly, the evidence was conflicting on this issue; nevertheless, in the evidentiary context of this case, we cannot say, as a matter of law, that the superior court erred in its determination that Hampton effectively waived his *Miranda* rights.

We next turn to Hampton's contentions that utilization of the statements made to the authorities violated his due process rights under both the United States and Alaska Constitutions. Hampton cites *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), in support of his position. Townsend, a known heroin addict and user of narcotics, was arrested by the Chicago police in connection with a robbery and murder. It had been one and one-half hours after his last dose of heroin. Townsend was experiencing withdrawal symptoms during interrogation and was administered phenobarbital and scopolamine, a drug claimed to be a "truth serum." The defendant confessed to the murder on two occasions, each time after having been administered the drug. In discussing the applicable law, the Supreme Court noted:

> Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's 'will was overborne' or if his confession was not 'the product of a rational intellect and a free will,' his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth serum.'[11] (footnotes omitted)

In *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–58 (1961), the United States Su-

preme Court noted that the following factors, combined with all of the surrounding circumstances, should be considered in determining the existence of a due process violation in an interrogation context: the duration and conditions of detention, the attitudes of the police manifested toward the accused, and the "diverse pressures which sap or sustain his powers of resistance and self-control." The majority of courts which have considered due process challenges to confessions based on the voluntarily-induced intoxicated state of the defendant have allowed admission of the confession, unless it is shown that he was intoxicated to a degree of mania or to the point that he could not understand the meaning of his statements.[12] In this case the drugs and the alcohol were self-administered. There was no evidence of undue police harassment. There was no significant period of detention prior to the first statement. Our independent review of the evidence shows that there is an evidentiary basis sufficient to conclude that Hampton's mental faculties were not significantly impaired during the relevant times in question. We thus conclude that Hampton has not shown that the use of the questioned statements violated his due process rights.

Our holding that Hampton's statements to Officer Rice were admissible is dispositive of Hampton's next contention in this appeal. The day following the shooting and interview with Officer Rice, Officer Carter and Investigator Pennington interviewed Hampton. At the outset of this interview, they read Hampton the *Miranda* warnings and obtained a signed waiver from him. The interview lasted approximately 45 minutes and culminated in a taped confession. Hampton's specification of error in this appeal is that this taped confession is the fruit of the previous unconstitutional interrogation by Officer Rice and thus should be suppressed.

---

**11.** *Townsend v. Sain,* 372 U.S. at 307–08, 83 S.Ct. at 754, 9 L.Ed.2d at 782.

**12.** *See* Annot., 69 A.L.R.2d 361 (1960). Where the defendant has taken drugs or narcotics, the courts have been somewhat more willing to

find involuntariness; however, these cases usually have involved administration of the drug by the police or someone connected with the police. *See* Annot., 69 A.L.R.2d 384 (1960).

Where successive confessions are obtained as part of a continuous process, courts have usually excluded all when the first confession is deemed to have been given involuntarily.[13] In his concurring opinion in *Darwin v. Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968), Justice Harlan discussed the problem of multiple confessions. He said:

A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition. If a first confession is not shown to be voluntary, I do not think a later confession that is merely a direct product of the earlier one should be held to be voluntary. It would be neither conducive to good police work, nor fair to a suspect, to allow the erroneous impression that he has nothing to lose to play the major role in a defendant's decision to speak a second or third time.

In consequence, when the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has, in my view, the burden of proving not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but also that it was not directly produced by the existence of the earlier confession.[14]

We think Justice Harlan's approach sound. Nevertheless, since we have held that Hampton's statement to Officer Rice is admissible, we find Hampton's argument that his taped confession should have been suppressed because it was the fruit of the previous allegedly unconstitutional interrogation conducted by Officer Rice has been mooted.

Appellant Hampton has advanced another specification of error which relates to the taped confession obtained by Pennington and Carter on the morning after the shooting. The entire interview took approximately 45 minutes to an hour, but the tape reflects only about 15 minutes. After giving Hampton his *Miranda* warnings and securing a signed waiver, Pennington talked to Hampton about the automobile accident, his dog and the shooting incident. After discussing these matters, Hampton agreed to make a statement. He was given the choice of writing it, telling it to Pennington who would type it, or taping it. Hampton chose taping. Pennington would ask a question and if Hampton did not understand, Pennington would reverse the tape and ask the question in a different way. All answers given by Hampton are on the tape; however, most pauses are not recorded, nor are all the questions recorded. The tape was admitted into evidence and the jury was allowed to take the tape into the jury room.

On appeal, Hampton contends that the superior court committed reversible errors in admitting the tape and allowing the tape to be taken to the jury room. He points out that since diminished capacity was central to his defense, the pauses between responses and his inability to answer and understand questions were particularly significant.[15]

13. *See, e. g., Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Takahashi v. United States,* 143 F.2d 118 (9th Cir. 1944).

14. *Darwin v. Connecticut,* 391 U.S. at 350–51, 88 S.Ct. at 1490, 20 L.Ed.2d at 634.

In *United States v. Bayer,* 331 U.S. 532, 540, 67 S.Ct. 1394, 1398, 91 L.Ed. 1654, 1660 (1947), the Supreme Court dealt with the admission of a confession obtained six months after a prior unconstitutional confession. The Court stated:

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first.

However, since the conditions under which the involuntary confession had been made had been removed and six months had passed, the Supreme Court held in *Bayer* that admission of the second was not improper.

15. We note that there was never a stipulation as to the commission of the homicide. Thus, whether Hampton shot Berfield, regardless of his mental state, was at issue when the confession was admitted.

■ *Bentley v. State,* 397 P.2d 976 (Alaska 1965), is this court's only decision addressing the question of the admissibility of tapes which contain only part of a conversation. There we stated:

Finally, we are not persuaded that the tape should have been excluded because of the court's lack of conviction that the recording was reliable. . . . It is true that from reading the transcript of the recording it appears that it contained only a part of the conversation between appellant and Mrs. Fambough. But that doesn't mean that it should be excluded. This is merely another factor for the jury to consider in considering the impeaching weight and significance of the recording.[16]

*Bentley* is in accord with the general rule with respect to tape recordings containing omissions which were not made purposefully to deceive. The general rule is that the recording is admissible unless the omissions are so substantial as to render the recording untrustworthy.[17] Our review of the record has led us to the conclusion that the trial court's admission of the taped confession did not constitute error. Here the jury was fully apprised of the fact that Hampton did not respond immediately and that he had had trouble formulating answers at times.[18] Since the jury was made aware of the fact that the questions and answers did not proceed as they appear on the tape, we hold that the superior court did not err in admitting the tape into evidence.

■ As mentioned previously, Hampton also contends that the superior court erred in permitting the taped confession to go to the jury room. The general rule is that it is within the sound discretion of the trial court whether to allow the jury to take a taped confession with them into the jury room once the confession has been admitted into evidence.[19] Section 5.1 of the ABA Standards Relating to Trial by Jury (Approved Draft 1968) allows confessions to be taken to the jury room in the trial court's discretion.[20] In the context of this litigation we cannot say that the superior court abused its discretion in permitting the taped confession to go to the jury room.[21]

■ In his opening statement, Hampton's counsel told the jury that his client would testify; however, when called to the stand, Hampton chose not to testify. The following interchange took place:

---

**16.** *Bentley v. State,* 397 P.2d at 978. The case was an appeal from a conviction for assault with a dangerous weapon. The tape has been made by a private detective agency and was offered solely to impeach the testimony of a witness through a prior inconsistent statement.

**17.** Annot., 57 A.L.R.3d 746, 749 (1974). *See also People v. Curry,* 192 Cal.App.2d 664, 13 Cal.Rptr. 596 (1961).

**18.** The prosecution first sought introduction of the transcribed statement, but the defense objected on the ground that in a crucial passage it might not be an accurate transcription. The prosecution then introduced the taped statement.

**19.** Annot., 37 A.L.R.3d 238, 243–50 (1971).

**20.** In the comment to § 5.1(a), at 130–31, the committee recognized a split of authority on the question and stated:

The Advisory Committee has concluded that the trial judge should have the authority to send admissions and confessions to the jury room, as it will sometimes be appropriate for the jury to give these documents close scrutiny.

We note further that Rule 531(c) of the Uniform Rules of Criminal Procedure (1974) provides:

The court shall submit to the jury all exhibits, other than depositions, received in evidence, except exhibits which:

(1) The parties agree shall not be submitted; or

(2) The court, upon motion of a party made any time before the jury retires, excludes from the submission. The court may grant the motion if it appears (i) the submission would unduly prejudice the party or (ii) the exhibit would likely be improperly used by the jury.

Part of the comment to the Uniform Rule states:

As stated in the Commentary to the ABA Standard, there is a split of authority on whether it is error to send written confessions or admissions to the jury room, and it would appear that they should normally be excluded under clause (2) as unduly prejudicial.

**21.** *See State v. Triplett,* 248 Iowa 339, 79 N.W.2d 391, 397 (1956); *State v. Gensmer,* 235 Minn. 72, 51 N.W.2d 680, 688 (1951).

MR. MOODY: Thank you, Your Honor. Your Honor, We call Mr. Hampton to the stand.

MR. HAMPTON: No, I'm not—I'll take the fifth.

THE COURT: The defendant does not wish to take the stand?

MR. MOODY: Could I have a moment, Your Honor?

THE COURT: Yes. He doesn't . .

MR. MOODY: Could we take a brief recess?

THE COURT: Recess? Very well. Ladies and gentlemen of the jury, remember the admonition. I think perhaps you're—I should recall that to you each time. We'll stand in recess for a few minutes.

Two days later, Hampton moved for a mistrial on the ground that the jury was prejudiced by Hampton's behavior.[22] The superior court denied the motion stating:

Any wilful, wrongful act by the defendant, whether or not it was calculated to upset the jury or the trial, cannot result in a mistrial. The act was voluntary upon his part. I have covered the matter in the instructions—I think adequately—so that there will be no prejudice to the defendant as a result of his own intemperate conduct. The motion for mistrial is denied.

On appeal, Hampton now claims that the prejudice did not stem from his behavior, but rather from the superior court's comments regarding his decision not to testify. Since this specific ground of objection was not presented to the superior court, we normally would not treat it on appeal unless it can be said that the trial court's questioned remark constituted plain error. We have held that a "plain error" is one which is obviously prejudicial and affects substantial rights.[23] Any comment on the choice of the accused not to testify is a violation of the explicit provisions of Alaska Criminal Rule 26(b)(6); the potential error was obvious. Since such a comment could result in an infringement on the accused's fifth amendment rights, the potential error affects substantial rights. Having concluded that the requirements for "plain error" have been satisfied, we turn to the merits of the issue.

 Based upon our review of the record and the tape recording of the proceeding, we are persuaded that the superior court's statement does not constitute error. The superior court's remark, "The defendant does not wish to take the stand?", in the context that it was uttered, is not in our view tantamount to a comment upon the accused's exercise of his privilege not to testify.[24] At most, we are presented with a

---

**22.** Counsel stated:

Yes, Your Honor, before we begin, I'd just briefly like to bring to the court's attention one problem that I have with what's gone before, and that is the result of Mr. Hampton's expression the other day in court in front of the jury, and that was followed by some confusion on everybody's part, and we continued the case to the next day and as it ended up Mr. Hampton did not take the stand and he expressed that view that he was not going to take it and he was going to claim his fifth amendment rights in front of the jury and on the basis of that I think it's very difficult for this jury to eliminate that from their mind and we would move at this time, Your Honor, for a mistrial on that—based on that little transaction.

**23.** *See Martin v. State,* 517 P.2d 1399, 1402 (Alaska 1974); *Burford v. State,* 515 P.2d 382, 383 (Alaska 1973); *Newsom v. State,* 512 P.2d 557, 560 (Alaska 1973); *Dimmick v. State,* 449 P.2d 774, 776 (Alaska 1969).

**24.** Criminal Rule 26(b)(6) specifically provides that when an accused exercises his privilege not to testify "no person shall make any comment thereon." In *McCracken v. State,* 431 P.2d 513, 517 (Alaska 1967), this court adopted the test articulated by the Tenth Circuit in *Knowles v. United States,* 224 F.2d 168, 170 (10th Cir. 1955). There the court stated:

It is concededly improper and reversible error to comment on the failure of a defendant to testify in his own behalf, and the test is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.

*See also Coleman v. State,* 553 P.2d 40 (Alaska 1976); *Armstrong v. State,* 502 P.2d 440 (Alaska 1972).

Although it is not at issue in this case, we note that the superior court characterized Hampton's behavior as "wrongful." This characterization is, of course, incorrect. Hampton

rather innocuous expression of surprise by the trial court.[25]

In the superior court, Hampton challenged the array of both the grand jurors and the petit jurors. In support of this challenge, Hampton submitted the affidavit of the assistant jury clerk for the Third Judicial District in Anchorage. In this affidavit, it is stated:

> As part of the qualifications sought of each [of the] petit and grand jurors we ask that they be a resident of the State of Alaska for at least one year prior to jury service. If a prospective juror indicates that he or she has not been a resident for one year we note that fact as a basis for excusing the juror. The jurors are actually excused by the presiding judge, but my experience has been that prospective jurors who indicate on their jury questionnaire that they have been Alaska residents for less than one year have consistently been excused from jury service.

Hampton challenged the jury array on two grounds: that it denied him his constitutional right to an impartial jury,[26] and that potential jurors had been excluded in violation of the equal protection clause of the 14th amendment to the United States Constitution. The motion was denied.

 The key question addressed in constitutional challenges to jury selection is whether the prospective jurors were drawn from a fair "cross-section of the community." [27] This court has stated:

> We recognize that the contours of a fair cross section of the community are elusive and, indeed, that they may not be susceptible of precise definition.[28]

Nevertheless, any method of jury selection which "is in reality a subterfuge to exclude from juries systematically and intentionally some cognizable group or class of citizens in the community" [29] must be held invalid.

The term "cognizable group" was defined by the federal district court in *United States v. Guzman*, 337 F.Supp. 140, 143–44 (S.D.N.Y.), *aff'd*, 468 F.2d 1245 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973), in the following manner:

> A group to be 'cognizable' for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace. (citation omitted)

The Supreme Court of California recently addressed a constitutional challenge to the California statute prescribing a one-year residency requirement for jurors in *Adams*

---

may have acted without due circumspection, but his behavior was not wrongful.

25. We also note that the trial court instructed the jury:

> In this case, the defendant has elected not to take the witness stand. You are hereby instructed that under the law he has the right not to take the witness stand if he so elects, and you are instructed that you are not to draw any unfavorable inference against him on that account.

26. U.S.Const. amend. VI; Alaska Const. art. I, § 11.

27. *Avery v. State*, 514 P.2d 637, 641 (Alaska 1973); *Malvo v. J. C. Penney Co., Inc.*, 512 P.2d 575, 580 (Alaska 1973); *Alvarado v. State*, 486 P.2d 891, 898 (Alaska 1971); *Green v. State*, 462 P.2d 994, 997 (Alaska 1969), *cert. denied*, 398 U.S. 910, 90 S.Ct. 1704, 26 L.Ed.2d 70. *See also Kimble v. State*, 539 P.2d 73, 79 (Alaska 1975); *Bachner v. Pearson*, 479 P.2d 319, 333 (Alaska 1970).

28. *Alvarado v. State*, 486 P.2d at 898–99.

29. *Green v. State*, 462 P.2d at 998.

*v. Superior Court*, 12 Cal.3d 55, 115 Cal. Rptr. 247, 524 P.2d 375 (1974). In upholding the requirement, the majority noted that before the process is held unconstitutional there must be "a common thread" uniting the excluded group, that is, "a basic similarity of attitudes, ideas or experience among its members so that exclusion prevents juries from reflecting a cross-section of the community." [30] The court then concluded that, under that standard, the excluded group did not form a cognizable class. The court noted, "[t]he group's membership—cutting across economic, social, religious, and geographical lines—changes day by day, creating a lack of real commonality of interest among the newly migrated." [31] The court went on to consider the equal protection challenge to the procedure, finding a rational relationship between the classification and some conceivable legitimate state purpose, specifically, the one-year resident's "acquaintance with local conditions, customs and mores." [32]

There is a one-year residency requirement for jury service in the federal courts.[33] The legislative history of the provision illustrates that the purpose of the provision is to guarantee "some substantial nexus between a juror and a community whose sense of justice the jury as a whole is expected to reflect." [34] The constitutionality of the provision has been uniformly upheld.[35]

■■■ Applying the "cognizable group" standards to less-than-one-year residents, we conclude that Hampton's sixth amendment right to an impartial jury was not impaired. The excluded group is not a static one with definite parameters. There is no common thread, "a basic similarity in attitudes or ideas or experience," except the lack of familiarity with the community. While circumstances can be imagined in which bias against a defendant member of the excluded group might exist, that possibility is too remote to justify reversal in the absence of a more specific suggestion of prejudice.[36]

■■■ At the suppression hearing, counsel sought to introduce testimony from two lay witnesses to show Hampton's "basic functioning level . . . [as] to whether or not he [could] in fact enter a knowing and intelligent waiver." After listening to a substantial part of the testimony of one of the lay witnesses, the court sustained an objection on the grounds of relevancy. Counsel for the defense made an offer of proof regarding the testimony of both witnesses. The subnormal intelligence of the

30. *Adams v. Superior Court*, 12 Cal.3d 55, 115 Cal.Rptr. 247, 250, 524 P.2d 375, 378 (1974).

31. *Id.*

32. *Id.*, 115 Cal.Rptr. at 252, 524 P.2d at 380.

33. 28 U.S.C. § 1865(b)(1) (1970).

34. 1968 U.S.Code Cong. and Admin.News, pp. 1792, 1796.

35. *E. g., United States v. Owen*, 492 F.2d 1100 (5th Cir. 1974); *United States v. Perry*, 480 F.2d 147 (5th Cir. 1973); *United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188; *United States v. Gast*, 457 F.2d 141 (7th Cir. 1972), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2426, 32 L.Ed.2d 668; *United States v. Grey*, 355 F.Supp. 529 (W.D.Okl.1973).

36. The foregoing holding that there was no denial of an impartial jury is dispositive of Hampton's equal protection claim. Hampton argues that there has been a violation of the less-than-one-year residents' rights to equal protection of the laws. Since he is not a member of the group, Hampton must show that he was harmed by the violation in order to assert the claim on their behalf. *See, e. g., United States v. Garrett*, 521 F.2d 444 (8th Cir. 1975); *In re Kundert*, 401 F.Supp. 822 (D.N.D.1975); *Levshakoff v. State*, 565 P.2d 504 (Alaska 1977). *Cf. Wagstaff v. Superior Court*, 535 P.2d 1220 (Alaska 1975) (counsel has standing to assert rights of unrepresented juveniles). In *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), the United States Supreme Court held that a white had standing to challenge a jury array which excluded Blacks. However, unlike Hampton, Peters was able to show prejudice stemming from the exclusion. Hampton also argues that his right to equal protection of the laws was violated by the exclusion of less-than-one-year residents. Since Hampton was afforded an impartial jury under sixth amendment standards, he has not shown a colorable equal protection claim. Therefore it is not necessary to further scrutinize the jury selection process under the equal protection clause.

accused is certainly relevant in determining whether there has been a knowing, voluntary and intelligent waiver.[37] Thus, testimony relevant to the issue of subnormal intelligence should be admissible. McCormick defines relevancy as "the tendency of the evidence to establish a material proposition."[38] It follows that the testimony sought to be introduced regarding Hampton's alleged subnormal intelligence is relevant on the issue of waiver and the evidence should have been admitted at the suppression hearing.[39] However, we have determined that even if the evidence had been admitted and believed, the evidence of subnormal intelligence would have been insufficient to support a finding of involuntariness on that basis. In *Schade v. State*, 512 P.2d 907, 916 (Alaska 1973), we considered a claim that the accused's mental illness rendered his confession involuntary. In that case we found that the accused "was basically rational and was not operating under coercive forces" and upheld the voluntariness of the confession. As *Schade* illustrates, the "basic functioning level" of the accused need not be particularly high in order to support a finding that the accused was capable of understanding the meaning of his rights and the consequences of his waiver. Our review of the record in the case leaves us with the conviction that even if the evidence had been admitted, there was ample evidence to support the court's determination of voluntariness. Thus, we conclude that exclusion of this evidence was harmless error.[40]

This brings us to the last issue in this appeal. Hampton was sentenced to life imprisonment after his conviction for first degree murder.[41] Given the seriousness of the offense, the record of the offender and the facts of the crime, we cannot say that we are convinced the sentencing court was clearly mistaken in imposing the sentence it did.[42] We therefore hold that the superior court's imposition of a life sentence for the crime of murder in the first degree was not excessive.

Affirmed.

**37.** For cases in which subnormal intelligence has been considered, see, e. g., *Coney v. Wyrick*, 532 F.2d 94 (8th Cir. 1976); *United States v. Morgan*, 394 F.2d 973 (6th Cir. 1968), *cert. denied*, 393 U.S. 942, 89 S.Ct. 310, 21 L.Ed.2d 279; *United States ex rel. Bishop v. Rundle*, 309 F.Supp. 312 (E.D.Pa.1970), *aff'd*, 437 F.2d 204 (3d Cir. 1971). *See generally* Annot., 69 A.L.R.2d 348 (1960). *See also Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

**38.** McCormick on Evidence § 185, at 435 (Cleary ed. 1972).

**39.** The superior court's grounds for excluding the evidence centered on the fact that the occurrences were remote in time from the purported waiver.

**40.** We reach this conclusion under either the *Love v. State*, 457 P.2d 622 (Alaska 1969), standard for nonconstitutional error, or the *Evans v. State*, 550 P.2d 830 (Alaska 1976), "harmless beyond a reasonable doubt" standard for constitutional error.

**41.** AS 11.15.010 provides:

A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall be sentenced to imprisonment for not less than 20 years to life.

**42.** *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970).

Hampton's presentence report reveals a long conviction record, beginning in 1970. He had previously been involved in an incident which resulted in the death of another person. The homicide involved in the case at bar was a particularly senseless one; in his confession, Hampton intimates that he shot Berfield because Berfield had borrowed $500 from him, had not returned it, and then charged him for the heroin.