Duncan Campbell WEBB, Appellant,

v.

STATE of Alaska, Appellee.

No. 2632.

Supreme Court of Alaska.

June 2, 1978.

See also, Alaska, 527 P.2d 35.

William H. Fuld, Robert L. Woodward and R. Michael Jackson of Kay, Christie, Fuld & Saville, Anchorage, for appellant.

Charles M. Merriner, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., CONNOR and MATTHEWS, JJ., and DIMOND, J. Pro Tem.

## OPINION

DIMOND, Justice Pro Tem.

Duncan Webb was convicted of being an accessory after the fact to the first degree murder of John Rich.[1] Webb had been attorney for Wesley Ladd, one of the murderers. Before shooting Rich to death,[2] Ladd forced Rich to sign a power of attorney, giving Duncan Webb the control of all of Rich's assets. After Rich had been murdered, Webb had his secretary witness the power of attorney. However, there was no evidence that Webb had taken part in the murder of Rich or that he had any advance knowledge it was going to happen.

Webb's involvement in the Rich murder consisted primarily of his lying to the police on several occasions. For example, Webb told the police that he had witnessed Rich's

---

1. AS 12.15.020 provides:

 *Accessories after the fact.* All persons who, after the commission of any felony, conceal or aid the offender with knowledge that he has committed a felony and with intent that he may avoid or escape from arrest, trial, conviction, or punishment are accessories. There are no accessories in misdemeanors. AS 11.10.010 states:

 *Parties to crime classified.* The parties to crime are
 (1) principals;
 (2) accessories.

2. A man named Zieger fired the first shot which wounded Rich seriously but did not kill him. A little while later, Wesley Ladd fired the second shot which killed Rich.

signing of the power of attorney, and that he had driven Rich to the airport on August 23, 1973, when in fact Rich had been murdered earlier that day. Webb's principal defense was that he had acted the way he did because of threats on his life by Rich's murderers, Ladd and Zieger.

It is the practice of the Third Judicial District to select as jurors only those persons who have been residents of Alaska for one year or more. Webb contends on appeal that this practice deprived him of his statutory[3] and constitutional right to an impartial jury[4] and was in violation of his rights to equal protection of the laws, which rights are guaranteed by the Fourteenth Amendment to the Federal constitution and Section 1, Article 1 of the Alaska constitution.

Similar arguments were made in *Hampton v. State*,[5] and in *Smiloff v. State*.[6] In rejecting an attack on the jury arrays in those cases, where persons with less than one year's residence in Alaska were excluded from the jury, we stated:

> There is a one-year residency requirement for jury service in the federal courts. The legislative history of the provision illustrates that the purpose of the provision is to guarantee "some substantial nexus between a juror and a community whose sense of justice the jury as a whole is expected to reflect." The constitutionality of the provision has been uniformly upheld.
>
> Applying the "cognizable group" standards to less-then-one-year residents, we conclude that Hampton's sixth amendment right to an impartial jury was not impaired. The excluded group is not a static one with definite parameters. There is no common thread, "a basic similarity in attitudes or ideas or experience," except the lack of familiarity with the

community. While circumstances can be imagined in which bias against a defendant member of the excluded group might exist, that possibility is too remote to justify reversal in the absence of a more specific suggestion of prejudice. (footnotes omitted)[7]

In *Smiloff* we referred to the *Hampton* decision, where we stated at page 148:

> The term 'cognizable group' was defined by the federal district court in *United States v. Guzman*, 337 F.Supp. 140, 143–44 (S.D.N.Y.), aff'd., 468 F.2d 1245 (2d Cir. 1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973), in the following manner:
>
> A group to be 'cognizable' for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace. (citation omitted)

Additionally, in *Smiloff*, we rejected the contention that AS 09.20.40 was violated by the one-year residency requirement, by holding that the statutory jury selection

---

**3.** AS 09.20.040 provides:

> *Compliance with statute.* The selection of jurors shall be made in substantial compliance with the following provisions. A failure in substantial compliance which prejudices the rights of a party is reversible error.

**4.** U.S.Const. amend. VI; Alaska Const. art. 1, § 11.

**5.** 569 P.2d 138 (1977).

**6.** 579 P.2d 28 Opn. No. 1637 (Alaska, 1978).

**7.** *Smiloff v. State*, 579 P.2d 28, Opn. No. 1637 (Alaska, 1978); *Hampton v. State*, 569 P.2d 138, 149 (Alaska 1977).

procedures were substantially complied with.[8] Similarly, they were substantially complied with in this case.

Despite the *Hampton* decision, at oral argument Webb's counsel still contended that the jury selection procedures deprived him of his constitutional rights. The basis of such argument was that persons like Webb, who are newcomers to Alaska, bring with them their own ideas concerning society and justice, and that such people could have related to Webb's state of mind at the time of his acts and at the time of trial, and that the exclusion from the jury of such persons left Webb with a jury comprised of people who "have been here long enough to 'know the ropes' and be familiar with the community, thus being less sympathetic and understanding with the plight of a new arrival."

 The gist of such an argument, if we understand it correctly, is that persons who have been residents of Alaska for less than one year have brought with them to this state a different standard of values than is held by residents of more than one year and thus would tend to more readily believe Webb's defense of duress, i. e., that he had acted as he had because of his fear of Rich's killers. Such an argument has no substance. Webb was constitutionally entitled to a trial by an "impartial jury."[9] There is no constitutional right to a jury composed of a cognizable group that would tend to be "partial" or biased or prejudiced against the state and in favor of the accused in a criminal case. Webb's contentions on the jury selection question are without any merit.[10]

 Count I of the indictment against Webb provides:

That between the dates of August 23, 1973, and December 3, 1973, at or near Anchorage, in the Third Judicial District, State of Alaska, Duncan Webb did unlawfully and feloniously after the commission of a felony, to-wit: murder, conceal or aid the offender or offenders with knowledge that he or they had committed a felony, to-wit: murder, and with intent that he or they may avoid escape from arrest, trial, conviction or punishment.

All of which is contrary to and in violation of AS 11.10.050 and against the peace and dignity of the State of Alaska.

Webb claims that Count I of the indictment should have been dismissed because it did not contain a "plain, concise and definite written statement of the essential facts constituting the offense charged," as required by Criminal Rule 7(c).[11]

Webb had two trials. The first resulted in a mistrial in August, 1974, when the jury could not agree on a verdict. The second trial resulted in a jury verdict in May, 1975, finding Webb guilty on Count I of the indictment and not guilty on Count II.[12] Count III of the indictment was dismissed.[13] In August, 1975, Webb received a sentence of two years, with all of that time suspended subject to supervised probation.

Prior to the first trial, in June, 1974, Webb filed a motion to dismiss all counts of the indictment. The motion alleged that Count I did not state a crime of which Webb could be convicted. The memorandum in support of that argument dealt with the allegation that Count I was based on hearsay evidence. No assertion was made

---

**8.** *Id.*

**9.** U.S.Const. amend. VI; Alaska Const. art. § 11.

**10.** Our decision that Webb was not deprived of his constitutional right to an impartial jury is dispositive of his claim that he was denied due process of law under the Federal and State constitutions.

**11.** Crim.R. 7(c) states in part:

The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.

**12.** Count II of the indictment accused Webb of violating AS 11.30.190, which deals with compounding or concealing a crime.

**13.** Count III of the indictment accused Webb of a violation of AS 11.30.315, which has to do with destroying, altering or concealing evidence.

that Count I was defective because it did not contain a plain, concise and definite written statement of the essential facts constituting the offense charged.

In June, 1974, Webb moved for a bill of particulars as to Counts II and III of the indictment. His motion was granted. At no time was a similar motion made as to Count I.

Also, this issue was not raised in *Webb v. State,* 527 P.2d 35 (Alaska 1974), where the court, on a petition for review following Webb's first trial and prior to his second trial, held that there was "adequate direct testimony to justify the indictment." 527 P.2d at 36. This court reviewed the grand jury transcript prior to rendering its decision. Neither Webb, nor this court on its own motion, mentioned any lack of specificity as a ground for objection to Count I of the indictment. This issue was raised by Webb for the first time in August, 1975, in his motion for a new trial following his conviction.

In light of these circumstances, we hold that Webb's belated attempt to challenge Count I of the indictment is not deserving of serious consideration by this court. We shall not dwell on the point further, except to say that any alleged lack of specificity in Count I apparently did not prevent Webb from preparing his defense in two separate trials based on the same indictment.

■ Webb claims that the indictment is invalid because the state refused to permit him to appear with his counsel before the grand jury, where he wished to present his defense of duress. There was no such refusal by the state. The prosecutor read to

the jury Criminal Rule 6(p)[14] and gave to the grand jury for their consideration a letter from Webb's counsel requesting permission to appear. The jury deliberated on this matter and stated their conclusion, as follows:

THE FOREMAN: Let the record reflect that while we were off record the matter, and the only matter discussed, was the matter of the letter delivered to the grand jury foreman as to whether or not one said defendant was to be heard, and the vote of the grand jury was unanimous not; that he not be heard.

The grand jury transcript lends no support whatever to the claim that it was the prosecutor who prevented the grand jury from hearing Webb. Furthermore, the grand jury had no obligation to hear him.[15] The law is quite well established that the accused has no right to appear before the grand jury in person or by counsel.[16] The grand jury's determination that it would not hear Webb did not invalidate the indictment.

■ Webb maintains that the indictment was invalid on another ground, i. e., that it was based on unjustifiable hearsay. Following Webb's first trial in 1974, we considered this identical point on a petition for review. We stated:

We have carefully reviewed the transcript of the hearing and hold that there was adequate direct testimony to justify the indictment. Moreover, the hearsay testimony was either peripheral or cumulative to direct testimony. We, therefore, do not reach the issue as to

---

14. Crim.R. 6(p) provides:
 Although the grand jury has no duty to hear evidence on behalf of the defendant, it may do so.

15. *Id.*

16. *United States v. Donahey,* 529 F.2d 831 (5th Cir. 1976), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976); *United States v. Tallant,* 407 F.Supp. 878 (N.D.Ga.1975); *United States v. Kernodle,* 367 F.Supp. 844 (M.D.N.C. 1973), *aff'd,* 506 F.2d 1398 (4th Cir. 1974); *United States v. Rosen,* 259 F.Supp. 942 (S.D.

N.Y.1966); *United States v. Elksnis,* 259 F.Supp. 236 (S.D.N.Y.1966), *cert. denied,* 390 U.S. 990, 88 S.Ct. 1186, 19 L.Ed.2d 1295 (1968); *Maiden v. State,* 84 Nev. 443, 442 P.2d 902 (1968); *State v. Eddington,* 83 Nev. 359, 432 P.2d 87 (1967), *cert. denied sub nom.,* Second Judicial Dist., *Court of Nev., Washoe County v. Nevada,* 390 U.S. 995, 88 S.Ct. 1195, 20 L.Ed.2d 94 (1968); *State v. Salazar,* 81 N.M. 512, 469 P.2d 157 (N.M.App.1970); *State v. Meek,* 9 Ariz.App. 149, 450 P.2d 115 (1969); *People v. Dupree,* 156 Cal.App.2d 60, 319 P.2d 39 (1957).

whether the hearsay testimony was improperly admitted. (footnotes omitted) [17]

Webb justifies his reiteration of this point by noting that this court articulated a new rule regarding the use of hearsay before the grand jury in *State v. Gieffels,* 554 P.2d 460 (Alaska 1976). *Gieffels* holds that for purposes of Criminal Rule 6(r), hearsay may be used by the grand jury only where there is a compelling reason for its use. Compelling was equated with "necessity," and the court further held that mere expense of transportation of absent witnesses was not a sufficient and necessary reason for the use of hearsay. 554 P.2d at 464–65.

Although *Gieffels* was decided after *Webb v. State,* 527 P.2d 35 (Alaska 1974), its holding is not dispositive here. In the earlier *Webb* case we held that "there was adequate direct testimony to justify the indictment," and that "the hearsay testimony was either peripheral or cumulative to direct testimony." 527 P.2d at 36 [footnote omitted]. Furthermore, in decisions subsequent to *Gieffels* we have held that where there is other evidence which will justify an indictment, the use of hearsay evidence in violation of Criminal Rule 6(r) will not invalidate the indictment. *State v. Taylor and Vail,* 566 P.2d 1016, 1019 (Alaska 1977). Webb's argument on this point is without merit.

■ Webb was an attorney at law. A search warrant was issued authorizing the police to search Webb's law offices for documents indicating that Webb had certain business relations with Wesley Ladd, Caye Mason, and John Rich, the man that Ladd murdered—which business relations dealt with the disposition of properties owned or operated by decedent Rich.

The person who issued the warrant was Judge Brewer of the district court. Webb produced an affidavit by Judge Brewer stating that when police officer James Vaden applied for the search warrant, he questioned Vaden under oath regarding the

search of an attorney's files. According to Judge Brewer, Officer Vaden "stated to me that all parties named in the Search Warrant were cooperating and had contacted the District Attorney's office, and . . . that this is the way that everyone wanted it done," and that "without this assurance from Mr. Vaden of the factual cooperation of all parties involved, this Search Warrant would not have been issued." [18]

Webb contends that the search warrant was invalid. Although his argument on this point is not clear, he appears to be asserting that Officer Vaden's allegedly sworn statement to Judge Brewer as to all parties cooperating was false and that such a false statement invalidated the warrant. This would be so because according to Judge Brewer, he would not have issued the warrant had he known that all persons affected by the warrant were not in fact cooperating with the law enforcement authorities.

Such an argument assumes that Judge Brewer would have been justified in refusing to issue the warrant had he known that "cooperation" of all parties was lacking. That is not a valid assumption. The request for the warrant was supported by a five-page affidavit that we have examined and which we believe shows sufficient cause to justify and require that a search warrant be issued. This was the view of the trial judge, and we agree with his determination.

■ In his brief on appeal, Webb apparently admits as much. He states:

Since there is a presumption that any judicial decision rests upon a proper finding, this Court perhaps must assume that Judge Brewer found probable cause while at the same [time] finding that the file was privileged under Civil Rule 43(h)(s) [sic] because of the attorney-client relationship.

Regarding the attorney-client relationship, the judge stated that he questioned Officer Vaden under oath "regarding the search of

17. *Webb v. State,* 527 P.2d 35, 36 (Alaska 1974).

18. Officer Vaden testified that Judge Brewer's affidavit is wrong as to what Vaden allegedly said.

an attorney's files." Assuming this means that the judge's reservations were based on the ground of an attorney-client privilege, as Webb appears to contend, we believe the judge was mistaken.

Here the client was Wesley Ladd and not the decedent Rich. The contents of the files all relate to Ladd's scheme to take over Rich's interests, which involved the murder of Rich by Wesley Ladd. Vaden's affidavit in support of the search warrant makes this quite clear. The affidavit in support of the issuance of the warrant, in the words of the trial judge, "sets forth facts justifying a fair inference that . . . the documents are evidence in a scheme of criminal conduct." We agree with the trial judge. In such case the privilege does not apply. As stated by Dean McCormick:

> Since the policy of the privilege [attorney-client privilege] is that of promoting the administration of justice, it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme. . . . Accordingly, it is settled under modern authority that the privilege does not extend to communications between attorney and client where the client's purpose is the furtherance of a future intended crime or fraud. (citations omitted) [19]

The only indication in Vaden's affidavit in support of the issuance of a search warrant that bears on the question of "cooperation" by Webb is paragraph 15, which states:

> Webb stated to your affiant that he would turn over all documents, letters and other papers regarding the business arrangement to Bridgett Rich, Rich's wife, during the period when Rich's whereabouts ostensibly were unknown, and that is, between August 22, 1973, and the time his body was discovered. Rich's widow has advised your affiant that she

has never received these documents, including the letter allegedly written by her husband to Ladd and described by Mason and Ramey from Duncan Webb;

. . . . .

In his own affidavit, Webb swears that Vaden's sworn statement, quoted above, was false and that "[I]n truth and in fact the statement made by this affiant to James Vaden was that any papers Mr. John Rich had given to this affiant to conduct his legal affairs would be returned to his wife if the alleged fact of his death was substantiated."

The statement by Vaden and that of Webb do not coincide as to all facts, but they are close enough in content for one to conclude that Vaden's assertion, assuming it to be a misstatement of fact, is not material to the showing of probable cause upon which the search warrant was based. As we have stated, there is sufficient probable cause in Vaden's affidavit, entirely apart from paragraph 15, to justify the issuance of the warrant.[20]

Webb argues, however, that Vaden's alleged misstatement, even though it might not be material to probable cause, still invalidates the warrant. In the case of *State v. Davenport*, 510 P.2d 78, 82 (Alaska 1973), we stated in n. 6:

> There was no showing at the suppression hearing that Gray intentionally distorted the facts as he knew them in an effort to obtain the warrant. We, therefore, do not now decide whether an intentionally falsified statement of nonmaterial fact in an affidavit will affect the validity of a search warrant.

It is difficult for us to tell whether Vaden's statement in paragraph 15 of his affidavit was an intentional misstatement of fact.[21] If what Vaden said was not an accurate account of what Webb had told him, such inaccuracy—in comparing Webb's

**19.** McCormick, Evidence § 95 at 199 (2d Ed. 1972).

**20.** *Davenport v. State*, 515 P.2d 377, 380 (Alaska 1973).

**21.** This question of credibility, as between Vaden and Webb, was not decided by the trial court. The trial judge merely said that the discrepancy need not be resolved in order to determine Webb's motion to suppress the evidence obtained by the search warrant.

affidavit with Vaden's—is not so material that we can assume that Vaden made an intentional misstatement of material facts. If Vaden misstated the facts in paragraph 15 of the affidavit, the misstatement was not so grave as to justify our holding that it amounted to a deliberate fraud on the court. Therefore, we need not decide here the question left undecided in *State v. Davenport*,[22] i. e., whether an intentional falsified statement of nonmaterial fact in an affidavit will affect the validity of the search warrant. We do not agree with Webb's contention that the warrant was invalid.

Webb claims that misconduct by the prosecutor during his final argument to the jury requires that Webb's conviction be reversed. In essence, the prosecutor told the jury that it is difficult to convict an attorney, particularly one who specializes in criminal cases, and that Webb had represented one of the "Brothers", a reputed criminal organization, in federal court a few weeks before.

■■■ No objection was made by Webb at the time the prosecutor made his remarks. The first objection was raised more than two months after Webb's conviction. In these circumstances, we shall not consider this point on appeal in the absence of plain error.[23] *Garroutte v. State,* 508 P.2d 1190, 1191 (Alaska 1973); *Rank v. State,* 373 P.2d 734, 737 (Alaska 1962). We perceive none here. The prosecutor's remarks do not appear to be highly inflammatory, nor do they seem "calculated and designed to produce an improper conviction." *Isaacs v. United States,* 301 F.2d 706, 737 (8th Cir. 1962).

■■■ It was established during the trial that Webb lied to the law enforcement authorities. He claims that his lies were protected by the constitutional guarantee of freedom of speech[24] and the privilege not to incriminate himself.[25]

Webb's lies to the police constituted the principal basis for his indictment and conviction of being an accessory after the fact to the crime of first degree murder. Speech is not constitutionally protected "when it is the very vehicle of the crime itself." *United States v. Varani,* 435 F.2d 758, 762 (6th Cir. 1970). There is no merit to Webb's point regarding free speech.

Nor is there any merit to the argument that Webb's constitutional right not to incriminate himself was violated. He was not compelled to lie. He had the privilege of remaining silent, which he chose not to do. "The Fifth Amendment privilege is to be silent; it is not a privilege to commit crime." *State v. Falco,* 60 N.J. 570, 292 A.2d 13, 21 (N.J.1972).

In *Harris v. New York,* 401 U.S. 222, 225, 91 S.Ct. 643, 645, 28 L.Ed.2d 1, 4 (1971), the United States Supreme Court stated:

> Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury.

Webb was charged in Count II of the indictment of a violation of AS 11.30.190, which provides in part:

> A person having knowledge of the commission of a crime who accepts or receives a gift, gratuity, valuable considera-

---

**22.** 510 P.2d at 82 n. 6.

**23.** Crim.R. 47(b) provides:
Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
*See Isaacs v. United States,* 301 F.2d 706, 736 (8th Cir. 1962), where the court said, in quoting from *Paschen v. United States,* (7th Cir.) 70 F.2d 491 at 502:
. . . the ordinary method for undertaking to keep overenthusiastic counsel within fairly reasonable bounds is to call the court's attention from time to time to alleged departures, and to procure from the court a ruling and direction with reference thereto. It does not appear that *at any time during* the argument objection was made to the things now urged as error, and we do not find these so palpably improper as would justify us in taking notice of them without timely objection, and thus to give opportunity for correction, if correction is necessary. (emphasis supplied)

**24.** U.S.Const. amend. I; Alaska Const. art. 1, § 5.

**25.** U.S.Const. amend. V; Alaska Const. art. 1, § 9.

tion, or other thing, or a promise of one of them, or a promise to do or cause to be done an act beneficial to him, with the understanding or agreement, expressed or implied, to compound or conceal the crime, or not to prosecute or give evidence of it . . . is punishable . ..

The jury acquitted him on this count.

█ Webb argues that since the judge had admitted at the time of sentencing that the evidence in Count II was insufficient and that he would have dismissed it regardless of what the jury did, the submission of this count to the jury invited a compromise verdict by the jury.

This point on appeal is merely stated in a cursory way and is inadequately briefed as required by Appellate Rule 11(b)(1)[g].[26] We shall not consider it further, except to say that there was substantial evidence to sustain the jury's verdict of guilt on Count I, and that there is nothing of which we are aware that gives rise to a reasonable suspicion that this was a compromise verdict.

Appellant argues three additional points on this appeal. They are all so lacking in merit that we shall not discuss them.

█ Webb received a sentence of two years' imprisonment. However, all of the sentence was suspended with Webb being placed on probation. The state, in a cross-appeal, contends that the sentence was too lenient.[27]

█ In imposing sentence, the judge took into account that Webb, an attorney at law, would probably be disbarred as a result of his conviction. The judge stated that he was required by this court's decisions "to consider the rehabilitation of the defendant,

the protection of society, the reaffirmance of societal norms, community condemnation or punishment." He then went on to express his view that incarceration does not rehabilitate people and that it ought to be reserved for cases where the defendant's character or the crime he committed demand that he be segregated from society.

We differ somewhat from the trial judge regarding his views that a jail sentence in this case would have no deterrent effect, and that people are not rehabilitated by being placed in jail. The Alaska Constitution requires that penal administration be based "on the principle of reformation and upon the need for protecting the public."[28] We have stated these principles are the "touchstones of penal administration."[29] The fact that a criminal should be rehabilitated or reformed does not mean that he should escape punishment for his misdeeds—

> The very opposite may be true. Penalties must be imposed in most instances in order to make rehabilitation effective, as well as to protect the public and deter others from engaging in criminal conduct.[30]

The judge stated that the goals of reaffirming societal norms would be amply accomplished by the two-year suspended sentence. Then the judge said:

> What Mr. Webb did was lie. He demonstrated in my opinion—in the court's opinion a certain basic weakness that one would hope is not evident in those entrusted with the practice of law, but again I emphasize, he didn't kill anybody. In terms of deterring, lying to the police, I have no evidence that would indicate that a jail sentence is anymore of a deterrent in that kind of a case than it is in many others.

**26.** App.R. 11(b)(1)[g] provides that the argument in appellant's brief "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on, and it shall be preceded by a heading indicating the subject matter."

**27.** Such an appeal is authorized by AS 12.55.-120(b). However, we may not modify the sentence in such a case, but only express our

approval or disapproval of it. *See State v. Lancaster,* 550 P.2d 1257, 1258 (Alaska 1976).

**28.** Alaska Const. art. 1, § 12.

**29.** *Borderwick v. State,* 569 P.2d 184, 188 (Alaska 1977), *quoting* from *State v. Chaney,* 477 P.2d 441, 444 (Alaska 1970).

**30.** *State v. Lancaster,* 550 P.2d 1257, 1259 (Alaska 1976).

Webb did more than simply lie. After the commission of a most brutal and cold-blooded murder, he concealed or aided the murderers with knowledge that they had committed first degree murder and with intent that they might avoid or escape from arrest, trial, or conviction.[31] This is a most serious offense, deserving of greater punishment than a two-year suspended sentence and probation.

It is true that Webb will probably be disbarred and, if so, will no longer be able to engage in the practice of law.[32] He has brought great dishonor upon the legal profession. His criminal conduct, employing conscious dishonesty, deserves greater condemnation than if it were committed by one not obligated to adhere to high standards of honor and integrity.

Considering all the circumstances, we feel that the judge gave little, if any, consideration to the need to "recognize and express community condemnation of the offender's anti-social conduct."[33] We do not question the judge's sincere purpose. However, we believe that he was clearly mistaken in not requiring Webb to be placed in prison for a reasonable length of time. We believe that a period of actual confinement was called for in light of the circumstances of this case and goals of penal administration which we have reiterated so many times. A period of confinement would unequivocally bring home to Webb the serious nature and consequences of his crime and would reaffirm society's condemnation of such offensive conduct.[34] We disapprove of the sentence as being too lenient.

The judgment is AFFIRMED.

CONNOR, Justice, dissenting in part.

I disagree with my colleagues only on the question of sentencing.

Webb's probable disbarment, and the personal disgrace which attends it, is a punishment which will be operative for many years, perhaps for the rest of Webb's life. In view of this, I cannot say that the trial court was clearly mistaken in imposing a probationary sentence upon Webb.

---

**31.** Webb was convicted of violating AS 12.15.-020. (*See* n. 1, *supra* ).

**32.** *See* Rule 23, Alaska Bar Rules, *Attorneys Convicted of a Serious Crime.*

