**David H. TUGATUK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 4402.**

Supreme Court of Alaska.

April 10, 1981.

---

Sue Ellen Tatter, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and HODGES, Superior Court Judge.

OPINION

RABINOWITZ, Chief Justice.

On the morning of September 16, 1977, in the Eskimo village of Aleknagik, Annie Maud and four of her children—Juline, age 9; Desmond, 5; Eugene, 3; and Adelaide, 18 months—were asleep in their home when David Tugatuk entered the residence, after a night of drinking, with a pistol in hand. He fired several shots and both Desmond and Adelaide were killed. Juline was shot in the arm, but she played dead and escaped further injury. Annie Maud, in getting up, threw blankets over Eugene, who was not shot. Enraged, Maud threw a hammer at Tugatuk and then ran out of the house. As she fled she was shot in the face by Tugatuk, but succeeded in making her escape. Maud testified that during the shooting Tugatuk told her the bullets were blanks and also told her not to go to her grandfather for help and that if she did he would kill her grandfather as well.

Tugatuk's sister testified that at 3 a. m. she was awakened by Tugatuk coming into the house with a gun and holster. She tried to take the gun away from him, but he told her he needed it to shoot a bear and then left the house again. The next morning Tugatuk's drinking partner awoke to discover a .22 caliber pistol and a number of bullets in his sleeping bag.

Subsequent to the shooting, Tugatuk went to the home of a local school teacher and asked to speak to him. Tugatuk was sobbing, and said that he was drunk. He urgently requested to be taken to town (Dillingham), because, he said, "I think I've killed someone"; when asked who had been killed, he said "Mauds." He said he wanted to turn himself in. After Tugatuk was driven to Dillingham, he made additional admissions concerning the shooting.

Tugatuk had a prior history of serious drinking problems for several years and had been drinking during the week prior to this incident. Earlier on the night of the shooting, he had consumed a bottle of whiskey with a friend. Though he had had quarrels with the Mauds, there is no indication in the record of any reason he would have harbored animosity toward them.

During the empanelling of the jury, Tugatuk's counsel informed the superior court that he believed the jury had been picked from a thirty-mile radius around Anchorage instead of a fifty-mile radius as is required by Criminal Rule 24.1(a). Tugatuk moved to strike the venire. After a hearing, the superior court denied the motion.

At trial, Tugatuk did not deny that he had committed the acts described above but did contend that he had lacked the specific intent requisite to culpability for first degree murder and attempted murder. His case consisted primarily of the testimony of two psychiatrists. Dr. Livingstone stated that he believed Tugatuk was addicted to alcohol and that its use had impaired his capacity to deliberate. Dr. Harris believed that Tugatuk suffered from an active psychosis and a dissociative reaction which impaired his capacity to form intent and to premeditate.

An instruction requested by the defense and approved by the superior court, to the effect that no adverse inference is to be drawn from the accused's failure to testify, was inadvertently omitted from the instructions given to the jury. Tugatuk's counsel discovered the omission after the verdicts were returned and used it as the basis for a motion for a new trial. This motion was denied.

Tugatuk was found guilty of two counts of first degree murder and two counts of attempted murder. He was sentenced to four concurrent terms, two of forty years on the murder convictions and two of ten years on the attempted murder convictions. Tugatuk appeals both his convictions and the sentences which were imposed.

## I. WAS THE JURY PANEL IMPROPERLY SELECTED?

During the voir dire, Tugatuk's counsel became concerned about the small number of Alaskan natives on the jury panel. Upon being informed that jurors were being drawn from the area within a thirty-mile radius of Anchorage, defense counsel argued that the procedures used were not in compliance with Alaska's criminal rules

and that those procedures denied Tugatuk his constitutional right to a jury composed of a fair cross section of the community. After conducting a hearing, the superior court concluded that the automatic exemption for potential jurors residing outside a thirty-mile radius was a long established practice in Anchorage. The superior court further stated that if it were to make a finding, that finding would be that the general rule requiring selection within a fifty-mile radius would not apply because of transportation expenses. The court also noted the considerable hardship which would be imposed on the prosecution if a continuance were granted. The superior court denied the motion to dismiss the jury panel and proceeded to trial with a jury from which all individuals who lived more than thirty miles from Anchorage had been automatically disqualified.

In this appeal, Tugatuk alleges as error the superior court's failure to grant his motion to dismiss the jury panel. Tugatuk asserts non-compliance with Criminal Rule 24.1 and a violation of his constitutional right to an impartial jury.

Criminal Rule 24.1 provides:

The jurors selected for service on a petit jury shall have the qualifications and shall be drawn and selected in the manner set forth by law, with these additional provisions:

(a) Jurors who serve on the petit jury shall be selected from the population within a fifty-mile radius of the urban center designated as the site of the criminal trial under Rule 18.1.

(b) If the court finds that the selection area determined in section (a) will not provide

(1) a petit jury which is a truly representative cross-section of the appropriate community or,

(2) selection of jurors under section (a) would cause unreasonable transportation expenses,

then the trial court, on its own motion or on the motion of the parties, may designate an area other than that specified in section (a) from which the petit jurors shall be selected.[1]

Tugatuk argues that the jury panel did not meet the requirements of Rule 24.-1(b)(2) for an exemption from the fifty-mile requirement. We disagree. The relevant language of the rule is: "If the court finds that . . . selection of jurors under section (a) would cause unreasonable transportation expenses, then the trial court . . . may designate an area other than that specified in section (a) from which the petit jurors shall be selected." This language is sufficiently broad to encompass judicial approval of deviations from the fifty-mile radius requirement when such a determination is made prior to the empanelling of the trial jury. In the case at bar, the superior court did make a determination pursuant to Criminal Rule 24.1(b)(2), and therefore we conclude that no error was committed in this regard.[2]

Tugatuk further argues that since Criminal Rule 24.1(b)(2) provides that the matter can be considered by the court "on its own

1. This rule was promulgated subsequent to *Alvarado v. State*, 486 P.2d 891 (Alaska 1971), where we found a violation of the right to a jury drawn from a fair cross section of the community. In that case, the jurors were selected from the population residing within a 15-mile radius of Anchorage.

2. Admittedly, the superior court's determination under Criminal Rule 24.1(b)(2) was conditional. The court stated:

I would think if a finding were to be made by me I would find that given the volume of jurors here in Anchorage, and given the significant cost—as a matter of fact it's—the cost of juror administration in the Anchorage area is a matter of widespread concern, not only in the justice system, but in the legisla-

tive as well, and it occurs to me that adding to the expense of administering the jury pool, adding to that the mileage fee for the folks beyond the 30-mile limit, would substantially increase the cost of juror selection and I believe that it would support a finding by the trial judge, and if I had to make it, would I believe so find.

In light of the foregoing, we hold there was substantial compliance with the rule. *See Calantas v. State*, 599 P.2d 147, 149 (Alaska 1979), where we said:

Selection of jurors by any method which fails to substantially comply with the statutory requirements is reversible error if the failure 'prejudices the rights of a party.' AS 09.20.040. Here there is no doubt that there were technical violations of the statutory se-

motion or on the motion of the parties," a full factual hearing must be provided before any deviation from the fifty-mile radius is permissible. Here ample opportunity was afforded to Tugatuk to offer evidence as to the appropriateness of making such a determination. Tugatuk also argues that: "[T]he court did not hear testimony concerning what expenses would be involved if jurors from the 30–50 mile radius were summoned. It merely found that the expense of summoning them would be unreasonable." Tugatuk tendered no evidence on this issue, and the superior court was informed that no expenses were paid in regard to those jurors within the thirty-mile radius while those from outside the radius did receive payment for their expenses. It follows that the superior court had a factual basis for its determination to deviate from the fifty-mile radius provision. Thus, we conclude that there was substantial compliance with Criminal Rule 24.1(b)(2) and that the randomness and objectivity of the selection of Tugatuk's jury was not affected.[3] *See Calantas v. State*, 599 P.2d 147, 149 (Alaska 1979).

In addition to his assertion that the superior court violated Criminal Rule 24.1(b)(2), Tugatuk claims that the superior court's approval of the departure from the fifty-mile radius rule violated his constitutional right to an impartial jury. This contention is based primarily on our decision in *Alvarado v. State*, 486 P.2d 891 (Alaska 1971). In *Alvarado*, the defendant was accused of having committed a rape near Chignik, which is a native village located approximately 450 miles from Anchorage. Alvarado was tried and convicted in Anchorage; he then challenged as unconstitutional the long-standing court practice of selecting jurors from the population living within a fifteen-mile radius of Anchorage. After an extensive discussion of the unique character of Alaskan rural life and the right to a jury composed of a fair cross section of the population, guaranteed by both the Federal and Alaskan Constitutions, we held:

> Because the source from which Alvarado's jury was drawn—namely, the area within a 15-mile radius of Anchorage—excluded virtually all residents of Native villages in the third judicial district, we are constrained to find that the jury empanelled in this case could not have adequately represented a fair cross section of the community in which the crime occurred, and that it therefore cannot be deemed impartial.[4]

In *Alvarado*, we went on to note that this holding was based on the fact that the selection procedure had excluded the community in which the accused lived and the crime had allegedly been committed, and that our holding would not apply to a crime committed in Anchorage. We stated:

> By our holding, we do not signify that use of the Anchorage 15-mile jury selection limit for cases arising in Anchorage is improper, nor do we overrule our prior decisions in *West v. State*, [409 P.2d 847 (Alaska 1966)], and *Crawford v. State*, [408 P.2d 1002 (Alaska 1965)]. Our decision does not mean that citizens from the town or village in which a crime has occurred may never be excluded from representation on the jury panel. As we have already noted, under certain circumstances it may be permissible to exclude the area of the crime from the source of jury selection. We further do not intend to hold that all differences among individuals, or that every conceivable group in the community, must be recognized for the purpose of representation on juries.

lection methods; like the Fifth Circuit, however, we believe that such violations 'constitute "substantial failure to comply" [only] when they affect the random nature or objectivity of the selection process.' *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977). [footnote omitted]

3. We note that there was no violation shown of AS 09.20.050(a), which provides:

If the superior court is located in different cities in the same judicial district, the administrative director shall prepare for each location of the court a list of the names of the qualified residents of that portion of the district considered by him to be appropriate. Those persons who were excluded from Tugatuk's venire because of the overlap rule were excluded in accordance with the manner the administrative director deemed appropriate.

4. *Alvarado v. State*, 486 P.2d 891, 903 (Alaska 1971).

Our ultimate objective is only that juries be selected at random from a source which reflects a fair cross section of the community in which the crime has allegedly occurred; if this goal is attained, the accused will truly have been judged by a jury of his peers. What we do hold, then, is that an individual should not be forced, against his will, to stand trial before a jury which has been selected in such a manner as to exclude a significant element of the population of the community in which the crime was allegedly committed. [footnotes omitted][5]

Tugatuk's reliance on *Alvarado* is considerably weakened, if not waived, by the fact that as a result of his exercise of a peremptory challenge of the superior court judge who was originally assigned to try his case, the trial was relocated to Anchorage, a judicial area which does not include Aleknagik, the village that Tugatuk lived in and in which the crime allegedly occurred.[6] In this regard, one of Tugatuk's trial counsel advised the superior court that:

> [T]he case was originally calendared for trial in Dillingham. And we had—it was our intention at that point in time to move for a change of venue out of Dillingham. Just because of the widespread publicity within the Bristol Bay area that this case has received .... [W]e did stipulate by Court agreement, if you will,

to a trial in Anchorage, rather than either Kodiak or Dillingham.

Thus, we conclude that the fact that Tugatuk's trial jury was not representative of a fair cross section of the community in which the crime allegedly occurred was not violative of *Alvarado.* However, it remains open to Tugatuk to argue that, given the fact that he lives in a rural village and that this was the setting for the crimes, a fair cross section of the community for a trial in Anchorage must include ample representation of the rural Alaskan life-style discussed in *Alvarado.*

■ Before this court will find constitutional error in the jury selection process, the accused must establish:

(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[7]

■ Assuming arguendo that the group alleged to have been excluded here, the occupants of native villages, is a distinctive or "cognizable" group, we cannot assume that the automatic exemption of all persons outside a thirty-mile radius of Anchorage reflects a systematic exclusion of this group

---

5. *Id.* at 904–05.

6. Tugatuk's counsel peremptorily challenged Judge Roy Madsen, who was responsible for trying superior court cases in Dillingham and Kodiak and was originally assigned to try the case. After Judge Madsen was challenged, the case was transferred to Anchorage.

7. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–87 (1979). *See Taylor v. Louisiana,* 419 U.S. 522, 537–38, 95 S.Ct. 692, 701–702, 42 L.Ed.2d 690, 702–03 (1975); *Hampton v. State,* 569 P.2d 138, 148 (Alaska 1977); *Green v. State,* 462 P.2d 994, 999 (Alaska 1969). *See generally* M. Daughtrey, *Cross Sectionalism in Jury Selection Procedures After Taylor v. Louisiana,* 43 Tenn.L. Rev. 1 (1975).

We have adopted the following definition of "cognizable group":

A group to be 'cognizable' for present purposes must have a definite composition. That is, there must be some factor which

defines and limits the group. A cognizable group is not one whose membership shifts *from day to day or whose members can be* arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace. *Hampton v. State,* 569 P.2d 138, 148 (Alaska 1977), *quoting United States v. Guzman,* 337 F.Supp. 140, 143–44 (S.D.N.Y), *aff'd,* 468 F.2d 1245 (2d Cir. 1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973). *See also Webb v. State,* 580 P.2d 295, 297 (Alaska 1978).

in the jury-selection process.[8] We conclude that Tugatuk failed to show that representation of this cognizable group in his venire was not fair and reasonable in relation to the number of such persons in the community. Thus, we hold that Tugatuk's claim that he was denied a jury representative of a fair cross section of the community must fail under the Alaska and United States Constitutions.[9]

## II. DID THE SUPERIOR COURT ERR IN NOT GRANTING A NEW TRIAL IN THE CIRCUMSTANCE WHERE THE COURT INADVERTENTLY FAILED TO GIVE A REQUESTED INSTRUCTION THAT NO ADVERSE INFERENCE WAS TO BE DRAWN FROM THE FACT THAT TUGATUK DID NOT TESTIFY?

Tugatuk did not take the stand and for that reason requested that the following instruction be given:

> The law does not compel a defendant in a criminal case to take the witness stand and testify, and no presumption of guilt may be raised, and no inference of any kind may be drawn, from the failure of a defendant to testify.

The state did not oppose it, and it was the superior court's intention and the understanding of counsel that the instruction would be given. However, through inadvertence, the instruction was not given. When he later discovered the court's failure to give the instruction, Tugatuk filed a motion for a new trial on this ground. The state opposed the motion and it was denied by the superior court.[10] We conclude that the superior court did not abuse its discretion in denying Tugatuk's motion for a new trial.

The record discloses that Tugatuk's counsel was provided with copies of the court's proposed instructions at 8 a. m. on the

**8.** We note that Eklutna and Knik are native villages under the Alaska Native Claims Settlement Act, *see* 43 U.S.C.A. § 1610(b)(1), (3) (West.Supp.1980); 43 C.F.R. § 2651.2 (1979); 39 Fed.Reg. 7472–73 (1974). Alexander, or Alexander Creek, has been certified as a native group. Alaska National Interest Lands Conservation Act of 1980, Pub.L.No. 96–487, § 1432(d), 94 Stat. 2371, 2543 (1980). All three are within a 30–mile radius of Anchorage.

**9.** In *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587 (1979), the Supreme Court said that:

> Initially, the defendant must demonstrate the percentage of the community made up of the group alleged to be underrepresented, for this is the conceptual benchmark for the Sixth Amendment fair-cross-section requirement.

In regard to the defendant's burden in these matters, the state argues that:

> Tugatuk did not present any statistics to the trial court, or to this court, and it cannot be said that the statistics that the state has provided this court through Merle Martin's affidavit furnish the defendant with this percentage. The affidavit's statistics do not show how many of the underrepresented group are within the 'community.' This appeal does not furnish this court statistics for either the jury pool that was used to select Tugatuk's panel, for a representative number of Anchorage panels, or for the jury pool had the 50–mile radius been used. Indeed, Tugatuk has not even furnished statistics concern-

ing his own panel. He has not met his burden of proof. [footnote omitted]

We think the state's arguments are correct and dispositive of the issue.

**10.** In denying the motion for a new trial, the court noted in part that:

> No objection was made to the court's inadvertent failure to give defendant's proposed 48. Because it is an instruction that touches a point of law that is so basic to our procedures, my first impression was that this was such an egregious omission that a new trial would have to be granted. I have considered that however, and I do not believe that my original apprehensive impression is an accurate and realistic way to view what has occurred. I have had some relatively brief access to the record. It's not an exhaustive listing—listening to the entire trial and all of the arguments in front of the jury, but I've been able to point to 5—or discover 5 places at least during voir dire examination in which the proposition, the defendant had no obligation to take the stand or produce witnesses was dealt with by individual jurors or in general remarks, and there was never an indication by any juror that they did not understand or were not in complete sympathy with this rule of procedure and law. I consider the nature of the case, the nature of the defense, it was not a factual defense hence was—it's inconceivable to me as I analyze it, how as the case developed, a reasonable juror could hold the defendant's failure to

morning that the jury was to be instructed. The record further shows that the preceding day the superior court had specifically cautioned counsel to carefully review the court's instructions. Although the failure to give the requested instruction was inadvertent, the state argues that Tugatuk failed to meet the requirements of Alaska Rule of Criminal Procedure 30(a), which provides, in part:

> No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objections.

From the foregoing, the state further contends that since defense counsel failed to comply with the requirements of Criminal Rule 30(a), the superior court's omission to give the requested instruction can only be noticed under Criminal Rule 47(b). This rule provides that:

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

■ We are in agreement with the state's analysis and conclude that Tugatuk's counsel bore the burden of reviewing the court's instructions and objecting to the court's failure to give the particular requested instruction before the jury retired to consider its verdicts. Given defense counsel's failure, Alaska Criminal Rule 47(b) permits, but does not require, this court to notice the superior court's omission if it is viewed as plain error affecting Tugatuk's substantial rights.[11] To constitute

plain error, the defect must be both obvious and substantial.[12] In other words, the failure of the superior court to give the requested instruction on the accused's silence should be recognized as plain error only if the omission was obviously prejudicial and such as to require this court's intervention to prevent a miscarriage of justice.

■ In our view, the superior court's inadvertent failure to give the requested instruction does not constitute plain error, and thus we hold that the superior court did not abuse its discretion in denying Tugatuk's motion for a new trial. At the time of the offenses in the case at bar, Alaska Criminal Rule 26(b)(6) provided:

> If the accused in a criminal action exercises his or her privilege not to testify or to prevent another from testifying,
>
> (i) no person shall make any comment thereon, and
>
> (ii) no presumption shall arise with respect to the exercise of the privilege, and
>
> (iii) no adverse inference shall be drawn therefrom by the trier of fact.

Subsequent to Tugatuk's trial, the Alaska Code of Evidence was promulgated. Alaska Rule of Evidence 512(c) provides:

> Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom.[13]

■ Alaska's current Rule of Evidence 512(c) and the commentary thereto are reflective of judicial precedent which indicates that trial courts are not obliged, *sua sponte*, to give an instruction pertaining to the accused's failure to testify, but that

---

testify against him so in fact as the state points out in its memorandum, the only type of information that the defendant could possibly have produced and that was the information pointing toward the suggestion that someone else had committed the offenses. It was introduced through other witnesses over the state's objection and for those reasons it is my judgment that this error can appropriately be termed harmless beyond a reasonable doubt.

11. *Avery v. State,* 514 P.2d 637, 643 (Alaska 1973).

12. *Evans v. State,* 550 P.2d 830, 843 (Alaska 1976). *See also Middleton v. State,* 577 P.2d 1050, 1054 (Alaska 1978).

13. The commentary to Rule 512(c) states, in part:

> Opinions will differ as to the effectiveness of a jury instruction not to draw an adverse inference from the making of a claim of privilege. Whether an instruction shall be given is left to the sound judgment of counsel for the party against whom the adverse inference may be drawn. The instruction is a matter of right, if requested.

upon request, the accused is entitled to have the jury so instructed.[14] In the case at bar, we view the accused's failure to object to the court's omission before the jury commenced its deliberations as functionally tantamount to a failure on the part of the accused to request the instruction. Furthermore, given the diversity of opinion regarding the effectiveness of this type of instruction, and the rule that Alaska's trial courts are under no duty to give such an instruction *sua sponte*, we conclude that its omission in the case at bar did not constitute plain error. In short, the subject instruction is not one that can be characterized as crucial to a fair trial in the absence of a request by the accused to have the jury so instructed. Thus, we conclude that the superior court did not abuse its discretion in denying Tugatuk's motion for a new trial.

## III. ARE THE SENTENCES EXCESSIVE?

■ As was noted at the outset, Tugatuk was convicted of two counts of first degree murder and two counts of attempted first degree murder. The superior court imposed four concurrent sentences—two forty-year terms on the separate first degree murder convictions and two ten-year terms on the

attempted murder convictions. Tugatuk appeals these sentences as excessive.

Tugatuk, an Eskimo, was twenty-six years old at the time of sentencing. He has no juvenile record of anti-social conduct but did begin to drink heavily in his late teens.[15] Four separate psychiatric examinations were made of Tugatuk. One psychiatrist concluded that he "does not suffer from a mental illness, but suffers from a severe problem of alcohol addiction." The two reports of the Langdon Psychiatric Clinic are unclear but suggest that, when intoxicated, Tugatuk's ability to reason is diminished and that once committed to a decision, he tends to act with perseverance. An examination in Fairbanks indicated that Tugatuk had a serious drinking problem but no mental impairment. A Seattle psychiatrist concluded that Tugatuk suffered from chronic alcoholism and periods of alcohol blackout.

The superior court, in sentencing Tugatuk, did not characterize him as a worst offender nor did it impose the maximum sentence of life for either of the first degree murder convictions. Our review of the sentencing court's reasons for imposition of the concurrent forty-year sentences persuades us that the court carefully fashioned

---

**14.** *State v. Baxter*, 51 Haw. 157, 454 P.2d 366, 367 (1969), and *People v. Gaulden*, 36 Cal. App.3d 942, 111 Cal.Rptr. 803, 811 (1974), indicate that there is no *sua sponte* duty to give the instruction because the instruction cuts both ways. *United States v. Greer*, 588 F.2d 1151, 1157–58 (6th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979), and *United States v. Williams*, 521 F.2d 950, 955–56 (D.C.Cir.1975), both hold in circumstances somewhat similar to the instant case that the failure to give the requested instruction is not plain error; *contra, State v. Persuitti*, 133 Vt. 464, 346 A.2d 208, 209 (1975). For a discussion of differing circumstances which make the giving of the instruction appropriate or inappropriate, see Justice Stevens' dissenting opinion in *Lakeside v. Oregon*, 435 U.S. 333, 342–48, 98 S.Ct. 1091, 1096–1098, 55 L.Ed.2d 319, 327–30 (1978). We note that the United States Supreme Court has recently held that the Fifth Amendment requires the giving of a "no adverse inference" instruction when such an instruction is properly requested. *Carter v. Kentucky*, — U.S. —, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). Since we have found that, in failing to object to the trial court's inadvertent omission, Tugatuk's counsel did not prop-

erly request this instruction, *Carter* has no effect on our holding in the present case.

**15.** His prior criminal record consists of the following offenses:

| DATE | LOCATION | OFFENSE | DISPOSITION |
|------|----------|---------|-------------|
| 02/10/71 | Kodiak, AK | Drunk in Private | $40.00 fine; 10 days suspended. |
| 08/21/72 | Dillingham, AK | Disorderly Conduct | $200.00 fine, $100.00 suspended; 30 days suspended. |
| 09/08/73 | Dillingham, AK | Drunk on Highway | 30 days. |

Tugatuk spent his childhood in the villages and left school in the 9th grade, although he did go on to the Alaska Skills Center and completed a training program as a gasoline engine mechanic. He has expressed ambitions of becoming an auto mechanic, but since the time of the training program, he has maintained a subsistence life-style by hunting, fishing, and trapping.

appropriate sentences in light of the *Chaney*[16] criteria, the facts of the offenses, and Tugatuk's background.

The minimum sentence for a conviction of first degree murder is twenty years and the maximum is life imprisonment.[17] We have on numerous occasions affirmed life sentences for first degree murder convictions.[18] Tugatuk's crimes, though alcohol related, resulted in the death of two small children and the wounding of another child and the mother. Given the gravity of the offenses and their devastating impact on the family affected, we hold that the superior court was not clearly mistaken and therefore that the sentences are not excessive.

Affirmed.

---

16. *State v. Chaney*, 477 P.2d 441 (Alaska 1970).

17. At the time of the offense AS 11.15.010 provided:

> *First degree murder.* A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall

be sentenced to imprisonment for not less than 20 years to life.

18. *See Vail v. State*, 599 P.2d 1371 (Alaska 1979); *Bendle v. State*, 583 P.2d 840 (Alaska 1978); *Wilson v. State*, 582 P.2d 154 (Alaska 1978); *Morgan v. State*, 582 P.2d 1017 (Alaska 1978); *Hampton v. State*, 569 P.2d 138 (Alaska 1977); *Gray v. State*, 487 P.2d 680 (Alaska 1971).