NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>Pacific</u> <u>Reporter</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

# IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |
|---|---|
| TEDDY SMITH,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-12309<br>Trial Court Nos. 2KB-12-603 CR<br>& 2KB-12-625 CR<br><br><u>O P I N I O N</u><br><br>No. 2640 — March 1, 2019 |

Appeal from the Superior Court, Second Judicial District, Kotzebue, Timothy Dooley, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Ann B. Black, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee. Erin Dougherty Lynch, Native American Rights Fund, Anchorage, for *Amicus Curiae* Association of Village Council Presidents, aligned with the Appellant. Susan Orlansky, Anchorage, for *Amicus Curiae* ACLU of Alaska Foundation, aligned with the Appellant. Thomas Amodio, Reeves Amodio, LLC, Anchorage, for *Amicus Curiae* Alaska Court System, aligned with the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Judge MANNHEIMER.

In early September 2012, in the village of Kiana, Teddy Smith fired a shotgun at a group of people. He then fled into the wilderness, where he spent seven to ten days subsisting on berries and water. Smith became exhausted and delirious, and he later reported that he had been visited by "inukins" — supernatural beings who are reputed to live on the tundra.

Eventually, Smith came upon a hunting cabin north of Kiana, along the Squirrel River. There was no one in the cabin when Smith found it, but the cabin contained food. Smith decided to stay in the cabin.

While Smith was there, two brothers — Paul and Chuck Buckel — arrived at the cabin. Paul had lived in Kotzebue for more than twenty years, and his brother Chuck was visiting from out of state. The Buckels were on a bear-hunting trip, and they had permission from the cabin owner to use the cabin.

Smith greeted the Buckels, identifying himself by a false name. Smith helped the brothers bring their gear into the cabin, and he conversed with them for about an hour. All of a sudden, Smith began screaming for the Buckels to "get the fuck out". Smith then grabbed his pistol and shot Chuck Buckel in the chest.

Smith forced the Buckels out of the cabin, and he ordered Paul Buckel to bring the brothers' boat closer to the cabin. After Paul tied off the boat, Smith shot Paul in the arm. Fearing for his life, Paul ran into the woods. His brother Chuck also tried to run, but because of his chest wound, he had to stop and lean against a tree to catch his breath. Smith watched Chuck from about ten feet away, but he did not shoot Chuck again. Eventually Chuck made his way into the woods, where the brothers were reunited.

In the meantime, Smith loaded most of the Buckels' gear into their boat, and then he took off in their boat down the river. When the Buckels discovered that Smith had left, they returned to the cabin and used the cabin owner's marine radio to call for help. The following morning, the state troopers arrived, and the Buckels were medivacked to receive care for their wounds. Both of them survived.

The troopers found Smith down-river from the cabin, and they took him into custody.

Smith was brought to trial in Kotzebue on charges of attempted murder, first-degree assault, first-degree robbery, and third-degree assault. He was convicted following a jury trial.

Smith now seeks reversal of his convictions. He raises a series of legal challenges to the rules that the Alaska Court System uses for summoning prospective jurors for criminal trials in court locations around the state — including the authority that the rules give the presiding judges of each judicial district to restrict the geographic area from which prospective jurors are summoned.

For the reasons explained in this opinion, we reject most of Smith's claims and we affirm the rulings of the trial court. But with respect to Smith's claim that he should be able to challenge a ruling made by the presiding judge of his judicial district to restrict the area from which jurors are summoned, we conclude that we must remand this case to the superior court for further proceedings on this matter.

*The law that governs the summoning of prospective jurors for trials in the different court locations within Alaska*

The Alaska Supreme Court has established venue districts for every court location in Alaska. These venue districts are defined by a venue map promulgated by

the Alaska Supreme Court.[1]  *See* Alaska Criminal Rule 18(a).  The purpose of these venue districts is to identify the court site where a defendant's trial will presumptively be held if the crime is alleged to have occurred within that venue district.

For example, as defined by the supreme court's venue map, the Kotzebue venue district is a sizeable region that (1) extends east from Kotzebue approximately 250 miles inland, (2) extends south from Kotzebue approximately 100 miles, and extends more than 150 miles northwest from Kotzebue along the coast of Kotzebue Sound, past Point Hope.  When a crime is alleged to have occurred within this district, the trial will presumptively be held in Kotzebue.

As might be imagined, all of the venue districts in Alaska include smaller towns and villages in addition to the court site itself.  For example, the Kotzebue venue district includes approximately a dozen smaller villages in addition to the regional hub city of Kotzebue.  But when the Alaska Court System prepares its lists of prospective jurors within the various venue districts — *i.e.*, the lists of people who can be summoned to serve on juries at the various court locations around the state — these jury lists will often exclude the people living in outlying towns and villages.

Under Alaska Administrative Rule 15(c) — a rule that was numbered "15(b)" at the time of the proceedings in this case — the list of prospective jurors for any particular court site is not drawn from the population of the entire corresponding venue district.  Rather, the list of prospective jurors comprises only the people living within a 50-mile radius of that court site, unless the presiding judge of that judicial district designates a different selection area.

---

[1]  This map is available at:
https://public.courts.alaska.gov/web/rules/docs/venuemap.pdf

In some venue districts, this 50-mile selection radius excludes a relatively small percentage of the population of that district. But in far-flung rural venue districts, the 50-mile radius rule can exclude the residents of many towns and villages.

In the Kotzebue venue district, for example, only two villages (Noorvik and Noatak) are located within a 50-mile radius of the Kotzebue court.

Moreover, for the past thirty years, the presiding judges of the Second Judicial District (the judicial district that includes Kotzebue) have concluded that the cost of transporting and housing prospective jurors from even these two villages is unreasonably high. For this reason, over the years, the various presiding judges of the Second Judicial District have exercised their authority under Administrative Rule 15(c) to alter the 50-mile jury selection radius. Instead of employing the normal 50-mile radius, these presiding judges have issued orders declaring that the list of prospective jurors for trials in Kotzebue should be confined to the people living within a 5-mile radius of Kotzebue.

In other words, the list of prospective jurors for trials in Kotzebue is essentially limited to the people living in or nearby the city of Kotzebue itself.

*The constitutional limitations on the Alaska Court System's authority to define jury selection areas based on cost and convenience*

On its face, Administrative Rule 15 gives the Court System, and the presiding judges of the four judicial districts, broad authority to define jury selection areas so as to reduce jury expenses and increase the convenience of jurors' travel and lodging.

However, the working of Administrative Rule 15 hinges in large measure on the boundaries of the various venue districts drawn in the supreme court's venue map.

And the driving force behind the supreme court's selection of those venue district boundaries is the supreme court's 1971 decision in *Alvarado v. State*, 486 P.2d 891 (Alaska 1971). *Alvarado* is the seminal Alaska case defining a criminal defendant's right to demand that prospective jurors summoned for jury service reflect the community where the crime is alleged to have occurred.

The defendant in *Alvarado* was an Alaska Native man who was charged with committing a rape in the village of Chignik.[2] This village is located on the Alaska Peninsula, approximately 450 air miles southwest of Anchorage, and the great majority of its residents were Alaska Natives who primarily pursued a rural, subsistence lifestyle.[3] However, the city of Anchorage was the specified court site for crimes committed in Chignik — and, under the jury selection rules that were in force at the time, the prospective jurors for Alvarado's trial were drawn from the people living within 15 miles of Anchorage.[4]

This 15-mile jury selection radius effectively excluded not only the residents of Chignik but also the residents of every other Native village. And even though the Alaska Natives comprised nearly 30 percent of the population of the Third Judicial District (where Anchorage is located), Alaska Natives comprised only 3.5 percent of the population of Anchorage.[5]

The supreme court held that the 15-mile jury selection radius — and its concomitant exclusion of jurors from Chignik and every other Native village — violated Alvarado's right under the Alaska Constitution to have prospective jurors drawn from

---

[2]   *Alvarado*, 486 P.2d at 892-93.

[3]   *Id*. at 894.

[4]   *Id*. at 892-93.

[5]   *Id*. at 895.

a pool of people that represents a fair cross-section of the community where the crime occurred.[6]

In reaching this conclusion, the supreme court relied on evidence presented to the trial court concerning the salient characteristics of Alaska Native cultures, and the profound differences between those Alaska Native cultures and the urban lifestyle that typified Alaska's larger cities, such as Anchorage. As the supreme court observed, the distinguishing characteristics of Alaska Native cultures include:

> economies which rely on hunting, fishing, and gathering activities, strong kinship bonds, isolation from those parts of Alaska that approximate mainstream America, different seasonal activity patterns, concepts of time and scheduling which ... may be quite different from those of mainstream America, and finally, very limited participation in the cash economy.

*Alvarado*, 486 P.2d at 894.

The supreme court noted that, even though most Alaska Native villages are exposed to some extent to the Western culture of Alaska's cities, "the gap separating Native villages from the mainstream of urban society is vast":

> Examples of the unique qualities of Native culture ... encompass such factors as ... childhood exposure to two languages, cultural disorientation reflecting the imposition on the Native villages of the dominant society's way of life, a distinct social history, ... and basic differences in family structure.

*Id.* at 895.

---

[6] *Id*. at 903-05.

Based on all of these significant differences, the supreme court concluded that "the remote Native villages of the third judicial district" — villages such as Chignik — were "vastly dissimilar from the metropolis of Anchorage":

> The gap stretching between these two distinct classes of community is of far greater magnitude than that which normally separates city from city or small town from city elsewhere in the United States. We are faced here with the order of differences which distinguishes one culture from another.

*Id.* at 900. And because of this cultural divide between life in Alaska's large urban centers and life in the Native villages, the supreme court held that, when a crime is alleged to have occurred in a Native village, it is unconstitutional to select prospective jurors in a manner that essentially excludes all residents of Native villages.[7] The supreme court declared that, in such cases, the pool of prospective jurors must include people who are *representative of* the community residing at the location of the alleged offense. *Id.* at 902.

This rule means that a jury can be validly selected even if the pool of prospective jurors does not actually include people living at the location of the alleged offense — what the law calls the rule of "vicinage".[8] Instead, the supreme court endorsed Alvarado's suggestion that the concept of vicinage was no longer an inflexible requirement of jury selection — "no longer a mechanical formula which requires, in all cases, that the jury be selected from the precise locale of the crime".[9]

---

[7] *Id*. at 895, 903.

[8] *Id*. at 896.

[9] *Ibid*.

Nevertheless, the supreme court declared that the concept of vicinage "serves primarily as a guide" to assessing whether the people who live in the jury selection area are properly "representative" of the community that lives at the location of the alleged offense. [10] Thus, even though the jury selection area does not include the residents of the place where the crime occurred, the people living in that jury selection area may "still reasonably represent a cross-section of the community [residing at] the scene of the offense" if the population of the jury selection area does not differ significantly from the population of the place where the crime occurred. [11]

In order to facilitate jury pools that comply with *Alvarado*, the supreme court promulgated Alaska Criminal Rule 18 and an accompanying series of venue district maps. [12] The current venue district map divides Alaska into 25 superior court venue districts, with each venue district containing a city or town designated as a suitable site for felony trials. As this Court explained in *John v. State*, "The supreme court's goal was that, by using Rule 18(b) in combination with the venue map, judges would be able to identify a presumptive trial site where the composition of the jury pool could be expected to satisfy *Alvarado*." [13]

However, if it is shown that the pool of prospective jurors prescribed by the provisions of Criminal Rule 18 and Administrative Rule 15(c) does *not* satisfy *Alvarado*,

---

[10] *Ibid*.

[11] *Id*. at 902 n. 29.

[12] *John v. State*, 35 P.3d 53, 55 (Alaska App. 2001); *see also Dana v. State*, 623 P.2d 348, 351 (Alaska App. 1981) (stating that a former version of Criminal Rule 18 was "directly aimed at avoiding the type of situation which gave rise to *Alvarado*").

[13] *John v. State*, 35 P.3d 53, 55 (Alaska App. 2001).

then the trial court must use a different pool of prospective jurors — because the constitutional requirements of *Alvarado* take precedence.

*The litigation of Smith's jury claims in the superior court*

As we explained earlier, Administrative Rule 15(c) normally calls for the list of prospective jurors to be drawn from the people living within a 50-mile radius of the court location, but over the years the presiding judges of the Second Judicial District have issued orders limiting the jury selection area for Kotzebue to a 5-mile radius. Thus, as a practical matter, the pool of prospective jurors included only the people living in and nearby Kotzebue itself.

Prior to Smith's trial, Smith's attorney filed a motion asking the superior court to expand the jury selection area to include everyone living in the entire Kotzebue venue district. (As we have explained, there are about a dozen villages scattered throughout the Kotzebue venue district.)

Smith's attorney argued that any smaller pool of prospective jurors would violate Smith's constitutional right under *Alvarado* to have the group of prospective jurors drawn from a pool that included a fair cross-section of the community where Smith's crimes allegedly occurred — *i.e.*, the village of Kiana and the surrounding areas.

The defense attorney also argued that any smaller pool of prospective jurors would violate the rights of all the village residents within the Kotzebue venue district — specifically, the right of these village residents to serve on juries. Smith's attorney noted that the total population of these outlying villages was significantly greater than the population of Kotzebue. Thus, jury pools in Kotzebue were being drawn from a minority of the residents of the venue district.

2640

In support of Smith's *Alvarado* claim (*i.e.*, his claim that a jury pool drawn solely from the residents of Kotzebue would not represent a fair cross-section of the community where the crimes occurred), Smith's attorney argued that *each and every* village in the Kotzebue venue district had its own distinct characteristics, and thus it was especially important for the jury selection area to include the village of Kiana. However, the defense attorney's fall-back claim was that the dozen outlying villages, considered as a whole, constituted a distinct cultural group that was not fairly represented by the residents of Kotzebue.

With regard to this latter claim (that the outlying villages, taken as a whole, constituted a distinct cultural group for purposes of an *Alvarado* analysis), Smith's attorney argued that these villagers were far more likely than the residents of Kotzebue to practice a subsistence hunting lifestyle. According to the defense attorney, this was important because it meant that these villagers would be more familiar with firearms, and they would more readily understand that Smith would have been able to kill the Buckels if he had wanted to.

The defense attorney also argued that the villagers living in Kiana and along the Squirrel River would be more familiar with people who believed in inukins — and, therefore, these villagers would be more likely to credit Smith's statements about encountering inukins while he was wandering in the wilderness, rather than immediately concluding that Smith was either lying or delusional.

The superior court, in a lengthy written decision, rejected the defense attorney's contention that the residents of the outlying villages constituted a group whose culture was distinct, for *Alvarado* purposes, from the culture of the residents of Kotzebue.

The superior court noted that, even though Kotzebue was a hub city, almost 75 percent of the residents of Kotzebue were Alaska Natives, with an additional

5 percent identifying themselves as having an Alaska Native heritage. (In Kiana, the percentage of Alaska Natives was 90 percent.) Perhaps more importantly, the superior court also found that the "attitudes[,] ideas, [and] experience" of Kotzebue residents exhibited a "basic similarity" to the attitudes, ideas, and experience of the people living in the other villages within the Kotzebue venue district.

The superior court explained that Smith was essentially asking the court to *assume* that, because Kotzebue was a city, the people living in Kotzebue must have a materially different culture and lifestyle from the people living in the smaller villages. But the court declined to make this assumption in the absence of evidence.

The court noted that even though Smith's attorney had made several assertions about the purported cultural differences between the residents of Kotzebue and the residents of the outlying villages, Smith's attorney "present[ed] no evidence that hunting or the subsistence lifestyle [was] any less prevalent in Kotzebue than in other communities [within the venue district]". Nor did Smith present any evidence that Kotzebue residents would not reflect "the same attitudes, ideas, and experiences as other residents of the [venue] district."

Apparently on its own initiative, the superior court examined census information comparing the residents of Kotzebue to the residents of Kiana, the residents of House District 40, and residents of the Second Judicial District as a whole. This data included information as to what percentage of residents identified themselves as Alaska Natives, or as having an Alaska Native heritage. The data also included information regarding how many people had salaried employment, how many people were unemployed, how many people were receiving food stamps, and how many households were multi-generational.

The court found that this data supported the conclusion that the residents of Kotzebue "[fell] squarely within the same culture as Kiana [and] House District 40",

and that there was "no cognizable group ... present in Kiana [or] House District 40" that was not "also present in Kotzebue".

And with particular respect to the belief in "inukins", the court noted that Smith presented no evidence regarding how many residents of Kiana believed in these supernatural beings. Rather, Smith's only evidence of this cultural belief was a decades-old Kotzebue newspaper article which stated that some residents of *Kotzebue* believed in inukins.

Based on all this, the superior court concluded that Smith had failed to show that a jury pool drawn from the residents of Kotzebue would not adequately represent the "attitudes, ideas[,] and experiences" of the residents of Kiana and the other villages within the Kotzebue venue district.

After the superior court issued this ruling, Smith's attorney separately challenged the presiding judge's decision to reduce the Kotzebue jury selection area from the normal 50-mile radius to a smaller 5-mile radius. As we have already explained, the Administrative Rules give presiding judges the authority to reduce a jury selection radius if the transportation and housing of prospective jurors from this normal 50-mile radius would pose an unreasonable expense.

Smith's attorney noted that, in the case of the Kotzebue jury selection area, the presiding judge's order declared that a 50-mile jury selection radius would pose an unreasonable expense, but the judge's order did not provide any of the data or financial information that the judge relied on when reaching this conclusion. The defense attorney asked the superior court to give him an opportunity to show that the presiding judge's conclusion was wrong, so that the Kotzebue jury selection area could at least be expanded to the normal 50-mile radius — a radius that would include the two villages of Noorvik and Noatak.

The superior court summarily denied the defense attorney's motion.

*Smith's claims on appeal*

On appeal, Smith asserts that all residents of Alaska have a right to serve on juries. Based on this assertion, Smith suggests that Administrative Rule 15(c) is unconstitutional, at least as it is applied in many areas of Alaska, because the 50-mile jury selection radius prescribed by Rule 15(c) often excludes significant numbers of rural residents, and because there are many areas of the state where these excluded rural residents are predominantly Alaska Native.

Smith did not raise this generalized, state-wide attack on Administrative Rule 15(c) in the trial court. Nor is it clear that Smith has standing to attack the method of jury selection that is employed in other areas of Alaska. We therefore will address Smith's contentions only as they apply to the method of jury selection in the Kotzebue venue district.

Smith contends that all residents of the Kotzebue venue district have a right to serve on juries, and that Administrative Rule 15(c) unlawfully abridges this right. But while courts often speak of jury service as a "right", such statements are generally made in the context of ensuring that all adults within a legally defined vicinage have an equal chance of being included in the lists of prospective jurors drawn from that vicinage.

As the Supreme Court of California has explained, citizens have no free-standing right to serve on juries:

> While trial by jury is constitutionally implanted in our system of justice, an individual's interest in serving on a jury cannot be held a fundamental right. The [jury trial] guarantee of the Sixth Amendment is primarily for the benefit of the litigant — not persons seeking service on the jury; and even though [a citizen is] lawfully qualified, a citizen may not

– 14 –                                                                      2640

> demand to serve on a jury. At most, the citizen is entitled to be considered for jury service. His interest in becoming a juror is clearly secondary to the interests of the litigants in securing an impartial jury, as shown by the traditional exclusion of prospective jurors for cause or upon peremptory challenge. Jury service is commonly viewed more as a combination of duty and privilege than as a right, sanctions being imposed for failure to appear.

*Adams v. Superior Court of San Diego County*, 524 P.2d 375, 379 (Cal. 1974).

Moreover, because Smith's argument implicitly rests on the concept of vicinage (*i.e.*, the assertion that all adults within a vicinage should have an equal chance of being included in the lists of prospective jurors), his argument is fundamentally at odds with our supreme court's decision in *Alvarado*.

As we have explained, *Alvarado* expressly holds that Alaska law does not incorporate the traditional notion of vicinage — and, thus, juries need not be drawn from the geographic locale where the crime was allegedly committed, so long as the pool of prospective jurors includes people who are *representative of* the community residing at the location of the alleged offense. *Alvarado*, 486 P.2d at 902. Thus, the decision in *Alvarado* implicitly rejects the idea that all citizens within a venue district have an equal right to be included in that district's lists of prospective jurors.

For these reasons, we reject Smith's argument that Administrative Rule 15(c) is unconstitutional because it authorizes the Alaska Court System to compile lists of prospective jurors that do not include all residents of the Kotzebue venue district.

We now turn to Smith's argument that the Alaska Court System is violating his rights under *Alvarado* by limiting the pool of prospective jurors to those people living within a 5-mile radius of the Kotzebue court.

To prevail on this claim, Smith must show (1) that the residents of the community where his crime occurred (Kiana and its environs) are members of a culture that is materially distinct from the culture of the residents of Kotzebue under the test announced in *Alvarado*, and (2) that a jury pool drawn from the residents of Kotzebue will fail to fairly and reasonably represent the culture of the residents of Kiana (in proportion to the number of Kiana residents within the venue district). *See Tugatuk v. State*, 626 P.2d 95, 100 (Alaska 1981). *See also Wyatt v. State*, 778 P.2d 1169, 1170-71 n. 2 (Alaska App. 1989) (clarifying that *Alvarado* does not invariably require that the jury selection pool include residents of the place where the crime occurred, so long as the jury selection pool includes a reasonable number of people who share the culture of that place).

Here, it was Smith's burden to affirmatively demonstrate to the superior court that the residents of Kiana and its environs were members of a separate, cognizable cultural group whose interests could not be adequately protected by a jury pool whose members were drawn from the residents of Kotzebue. *See Hampton v. State*, 569 P.2d 138, 148 (Alaska 1977); *Dana v. State*, 623 P.2d 348, 351-52 (Alaska App. 1981).

In *Alvarado*, the supreme court found that the defendant met this burden through census and sociological data of the kind that the superior court examined in Smith's case, as well as through the testimony of a professor of sociology and the affidavits submitted by a cultural anthropologist and by the former director of the Alaska Human Rights Commission. [14]

But as we have already explained, Smith relied on arguments and assumptions that were supported by very little evidence.

---

[14] *Alvarado v. State*, 486 P.2d 891, 894-95 (Alaska 1971).

Unlike the defendant in *Alvarado*, Smith did not provide the superior court with testimony or other evidence to back up his assertion that the residents of Kotzebue and the residents of the outlying villages constituted two distinct cultural groups. Indeed, the only evidence pertinent to Smith's claim was the census data that the superior court provided *sua sponte*. And based on the record in front of it, the superior court concluded that Smith had failed to meet his burden of proof.

To the extent that the superior court's ruling rested on questions of fact — for example, findings regarding the general attitudes, experiences, and lifestyles of the residents of Kiana versus the residents of Kotzebue — we conclude that the superior court's findings are not clearly erroneous.

The superior court's ruling also rested on its legal conclusion that, whatever differences might exist between life in Kiana and life in Kotzebue, those differences did not amount to a "cognizable" cultural difference for purposes of *Alvarado*, *Hampton*, *Tugatuk*, and *Wyatt*. We review this aspect of the superior court's ruling *de novo*.

But given the superior court's ultimate finding of fact — its finding that Smith failed to establish *any* significant differences between the attitudes, ideas, and experience of Kotzebue residents and the attitudes, ideas, and experience of the people living in the other villages within the venue district — we affirm the superior court's legal conclusion that Smith failed to demonstrate any cognizable cultural difference for purposes of *Alvarado*, *Hampton*, *Tugatuk*, and *Wyatt*.

We therefore reject Smith's claim that the Alaska Court System violated his rights under *Alvarado* by limiting the jury selection area to a 5-mile radius of Kotzebue.

Finally, Smith argues that even if the 5-mile jury selection radius did not violate his rights under *Alvarado*, this jury selection area was nevertheless unlawful because the presiding judge of the Second Judicial District lacked a sufficient *factual*

*basis* for reducing the Kotzebue jury selection to a radius of 5 miles, rather than using the normal 50-mile jury selection radius prescribed by Administrative Rule 15(c).

As we have explained, the presiding judge's order was based on a finding that the transportation and housing of prospective jurors from Noorvik and Noatak (the two villages within a 50-mile radius of Kotzebue) would pose an unreasonable expense. In the superior court, Smith argued that the facts did not support the presiding judge's finding, or (alternatively) that conditions had changed since the presiding judge made this finding, and the finding was now outdated. But the superior court refused to grant Smith an evidentiary hearing on this issue.

We conclude that it was error for the superior court to refuse Smith a hearing on this issue. In reaching this conclusion, we express no opinion as to whether the facts support the presiding judge's finding that it would be unreasonable for the Court System to bear the cost of transporting and housing prospective jurors from the villages of Noorvik and Noatak. Nor do we express any opinion as to what remedy Smith would be entitled to, even if he could show that the presiding judge's finding was not supported by the facts.

*Conclusion*

Based on the findings of the superior court, we reject Smith's claim that the jury selection pool in his case failed to represent a fair cross-section of the community living where the crime occurred. We also reject Smith's claim that all adult citizens living in the Kotzebue venue district have a right to serve on juries, and that Alaska Administrative Rule 15(c) is unconstitutional because it restricts the jury selection area to a 50-mile radius of the court location.

But with respect to Smith's claim that the facts do not support the presiding judge's decision to restrict the Kotzebue jury selection area to a 5-mile radius (rather than the normal 50-mile radius prescribed by Administrative Rule 15(c)), we conclude that it was error for the superior court to deny Smith a hearing on this issue.

We therefore remand Smith's case to the superior court, to give Smith the opportunity to make his case that the costs of transporting and housing prospective jurors from Noorvik and Noatak — the two villages within a 50-mile radius of Kotzebue — would not be unreasonable. If Smith establishes that the cost of summoning prospective jurors from these two villages would not be unreasonable, then the superior court should decide the further issue of whether Smith is entitled to any relief.

The superior court shall conduct these additional proceedings within 90 days of the issuance of this opinion. After the superior court issues its decision on these matters, the parties (either or both of them) shall have 30 days to seek our review of the superior court's decision. We retain jurisdiction of this appeal for that purpose.